JOURNAL ENTRY AND OPINION
Defendant-appellant James Waver appeals from his convictions for two counts of rape in violation of R.C. 2907.02, both with sexually violent predator specifications, and one count of felonious assault, in violation of R.C. 2903.11, with a sexual motivation specification. The appellant was sentenced to a term of ten years to life imprisonment on each of counts one and two and eight years imprisonment on count three. All sentences were ordered to be served consecutively.
On May 8, 1997, Connie Thomas was raped by the appellant. Ms. Thomas and the appellant lived together off and on for ten years. Of Ms. Thomas's five children, the youngest two were fathered by the appellant. The appellant and Ms. Thomas separated about a month prior to the rape. Prior to the separation, they lived near Cedar on East 31st Street, Cleveland, Ohio. During the three years Ms. Thomas lived on East 31st, the appellant lived with her only part of the time.
On cross-examination, Ms. Thomas testified:
 Q. Would you describe your relationship as a very loving one, or a hostile one?
A. Sometimes loving, sometimes hostile.
Q. It gets pretty violent?
A. Violent, sometimes, yes.
 Q. What was the reason for this hostility, this violence?
 A. He always figured I was messing around with somebody.
Q. He thought you were messing around?
A. Yes.
Q. And were you?
A. No.
Q. Okay. All right. Go head.
 A. I always told him, if I did mess around, I didn't need him there, because he didn't help me do anything anyway. So, if I was to mess around, I wouldn't need him around to do it.
 Q. So, during this time since 1989, there were large blocks of time that you were not together?
A. Yes. He was in jail most of the time.
(T. 141-142). Ms. Thomas also testified on cross-examination that her five children were all in foster care (T. 145, 146).
For the three days just prior to the rape, Ms. Thomas moved into an abandoned house just across the street. The home she had been living in was condemned and torn down. Both the appellant and Ms. Thomas were employed by Minute Man temporary agency. She was currently assigned to work second shift at the Cleveland Clinic in the laundry-room.
On the evening of May 7, 1997, the appellant met Ms. Thomas after work. At that time she gave him her work ticket. The ticket was needed to receive a paycheck from Minute Man. The appellant and Ms. Thomas spent the evening drinking and talking (T. 145). Early in the evening she had a beer, but later on was not drinking. Ms. Thomas did use crack cocaine (T. 147) at approximately 4:00 a.m. The appellant also used crack that night (T. 151).
Around 6:30 a.m. on May 8, 1997, the appellant took both tickets to Minute Man. He received his paycheck, but Minute Man would not give the appellant her check. On his way back from Minute Man, the appellant stopped to buy beer. When the appellant returned to the abandoned house, he accused Ms. Thomas of "messing around' with someone else. He tore her pants off in order to check to see if she was `wet' (T. 31). He placed his fingers in her vagina without her permission or consent (T. 31). The appellant found her to be "wet' and stated "Bitch, I'm going to kill you." (T. 32). The appellant's actions were forceful. He went to the kitchen and came back with a pipe. At some point he either placed his fingers or the pipe in her anus and ripped her apart (T. 33). She believed that the appellant used his fingers, but there was a point in time where she was unconscious (T. 33). The appellant proceeded to beat her with the pipe, breaking both of her arms. She was also struck on her hip and head. Ms. Thomas was bleeding and defecated on herself. The last she remembers she was covering her head. When she woke up, she was on the floor and the appellant was no longer present.
When she came to, Ms. Thomas ran to the home of Mr. Jeff King, a neighbor, in order to use the telephone. She had on only her Cleveland Clinic shirt and a sweater. When she arrived at Mr. King's house, she saw the appellant on the telephone. She ran back to the abandoned house, put on a pair of pants, and ran towards Euclid Avenue. She asked a man she saw to take her to the police. He refused, but said he would telephone the police. Ms. Thomas continued running toward Euclid Avenue. The police stopped her just before she reached Euclid.
The police officers transported Ms. Thomas to St. Vincent Charity Hospital. The medical records, which were submitted in evidence with the stipulation of the parties, reveal that Ms. Thomas suffered a severe perineal and anal laceration. St. Vincent's did not have a surgeon able to perform the required repairs, so Ms. Thomas was taken by ambulance to Metro General. The injury to the perineum was so extensive that it required anaesthesia to perform a proper examination. Once anaesthetized, surgery was performed reconstructing the perineum and anus. Additionally, casts were placed on both the victim's arms. Ms. Thomas remained hospitalized for five days and was released to her mother's home where she continues to live.
On re-direct examination, Ms. Thomas disclosed that all of her children are in foster care. Ms. Thomas is fighting to have custody of her children returned to her and towards this end she has completed parenting classes (T. 165, 166).
Also on re-direct examination, the following information was elicited:
 Q. You were asked about your relationship over the last eight or nine years. I believe you testified you were together part of the time, and there were times, like when he was in prison, or jail that you were not together, obviously?
A. Yes.
 Q. And you characterized it as being sometimes peaceful, and sometimes a hostile relationship?
A. Yes.
 Q. And sometimes it would be violent, as I recall your testimony?
A. A lot of times it was violent.
 Q. All right. Well, where did the violence come from, you or from the defendant?
A. From him as far as hitting on me.
 Q. Had he ever beaten you up before May the 8th, 1997?
A. Yes.
 Q. Going back from that day, when is the last time before that date that he had beaten on you?
 A. It was close to Mother's Day of 1996, because I had a real bad black eye. He took me to the hospital, and they took the kids while I was at the hospital.
Q. What hospital was that?
A. That was at Charity.
Q. Did you receive any court order after that?
 A. Yeah. I applied for a temporary restraining order, and I came down to the Justice Center and they took pictures from the crime unit, or whatever you call it.
 Q. And as a result of that, was he ordered to stay away from you?
 A. Yes. I think he did maybe a month in jail, maybe. And then he had probation. (T. 166-167).
On re-cross examination, Ms. Thomas was again questioned about her children:
 Q. Okay. Now, you're trying to get your children back now, is that correct?
A. Yes.
 Q. And was a stipulation made to you that you had to prosecute Mr. Waver for this charge?
 A. No. It wasn't like put that way, but it was like, because if I don't; if he doesn't go to jail, I would take him back, and the kids would be in danger again. They would be in danger, because he tried to kill me. So, why wouldn't he try to kill them?
Q. I don't think I quite understand that?
 A. They didn't say I had to prosecute him, but Defendant-appellee
Q. Who said this to you?
* * *
 A. They said, if he was free that I would die, because normally I would take him back. And then he already tried to kill me. He would hold me and my daughter hostage, so he would be an endangerment to the kids also.
Q. Who said this to you?
 A. There is what Valerie Epps, the social worker, the supervisor or whatever her status is, said.
Q. Valerie Epps?
A. Yes.
 Q. She told you that in order for you to try to get your children back Defendant-appellee I see you're shaking your head.
 A. She didn't say that. I'm just saying that she said if he is let free, I'm going to take him back like I normally do, then that would be an endangerment to my children.
 Q. So, in other words, in order for you to get your children back, it's necessary for Mr. Waver to go to jail?
 A. No, no that's not what they said. They said I was going to make Defendant-appellee they said you're going to take him back like you always do. You always have. I said, he tried to kill me this time. This time this is a little different, you know.
(T. 169-172)
These questions continued, and eventually counsel elicited an admission that if Ms. Thomas continued her relationship with the appellant she would not be able to have custody of her children returned to her. While the incarceration of the appellant would not be the only way she could secure her children, Ms. Thomas indicated that it would be considered "a plus" (T. 173).
Cleveland Police Officer David Zemba was flagged down by Ms. Thomas sometime before 8:00 a.m. He was patrolling near East 30th and Euclid. Ms. Thomas was mostly naked (T. 74), had blood on her legs, and had about her an odor of vaginal fluid (T. 75). Because Ms. Thomas was crying and hysterical, the officers found it difficult to elicit information. The officers transported her to the hospital.
Mr. Jeff King has been friends with both the appellant and the victim for the last three years. They lived down the street, and he permitted them to place food in his refrigerator and use his telephone. Mr. King, a retired chef, has lived in his present home since 1965. On May 8, 1997, the appellant arrived at his house at about 8:00 a.m. That morning, the appellant told him that Ms. Thomas had been raped. Mr. King told the appellant that he should be with Ms. Thomas. The appellant responded that if he went to Ms. Thomas, they might put him in jail (T. 55). A little later, Ms. Thomas came to the door. She was crying and had no clothes on below the waist. When she saw the appellant she looked scared. She ran back up Cedar (T. 56).
Mr. King stated that the appellant sat for a while and then called someone. He was picked up by someone in a brown car, but he returned later that day. The police arrived between six and seven that evening. They spoke to the appellant and eventually placed him under arrest.
Cleveland Police Detective Donald Eel is a member of the Scientific Investigation Unit (SIU). He photographed the injuries of Ms. Thomas. These injuries included puffiness around the eyes; a black right eye and blackened bruises on her right eye; arms both in casts; abrasions on the right hip; and abrasions on the back of the legs. Detective Eel also photographed Ms. Thomas' rectal area, which had been extremely traumatized (T. 83). Joseph Serowick is employed in the Forensic Scientific Laboratory as a serologist. Serowick found blood on swabs taken from Ms. Thomas' skin and rectum. When he received the black pants they had already been torn beyond repair. The stains on the pants tested positive for human blood. The metal ratchet tool tested negative for the presence of blood.
Cleveland Police Detective Patricia Coleman was present when the ratchet was found in the basement of the abandoned house on the corner of East 31St and Cedar. The basement was located near the garage and had no steps leading down. There were no lights in the basement and it was full of cobwebs. The flashlights revealed the ratchet lying towards the north end of the basement. The home itself was filthy and full of garbage, but no other metal objects were found. The officers did find a pair of ripped and stained black pants.
The appellant testified on his own behalf. The appellant is employed by Minute Man and works at American Rubbers on the second shift. He lives at a home on East 79th Street, but keeps his work clothing at the home of Jeff King because Mr. King lives close to work. He was with Ms. Thomas on the night in question and, as she testified, they stayed up all night. Waver confirmed that he and Ms. Thomas had ingested crack during the night, but he disagreed with her as to the time. He also admitted to drinking only one 40 ounce beer.
The appellant left the abandoned home about 6:30 or 7:00 a.m. to go the residence on East 79th street in order to retrieve dress clothing for an interview with Human Services for food stamps. He never returned to the abandoned home. When Waver left to gather his clothing for the interview, he walked from the abandoned home, on East 31st Street, to the residence on East 79tb Street. When he arrived no one was home and he had no key. He returned to Mr. King's house to change into clean work clothes instead. This walk took approximately 35 minutes each way. While en route back to Mr. King's house, the appellant spoke in passing with a man named Darrell. During this conversation Waver learned that Ms. Thomas had been raped.
The appellant affirmatively testified that he has never committed a violent crime and that he did not harm Ms. Thomas. The only time he laid a hand on her was to defend himself when she attacked him. In fact, when he returned to Mr. King's home he called the police. The appellant testified that he telephoned Ms. Thomas' uncle who then picked him up. The two of them went in search of Ms. Thomas.
The appellant sets forth ten assignments of error. Since the first, second and tenth assignments of error each assert that appellant's convictions were not supported by sufficient evidence, these assignments of error will be considered first.
The first assignment of error:
I
 THE COURT'S FINDING OF GUILT OF THE SEXUALLY VIOLENT PREDATOR SPECIFICATION IS NOT SUPPORTED BY THE EVIDENCE.
The appellant asserts that the trial court erred in finding him to be a sexually violent predator as charged in counts one and two of the indictment. The appellant argues that neither his current convictions not his prior behavior fall within the scope of R.C. 2971.01(H). The state contends that the court properly found the appellant guilty of the sexually violent predator specification because Ms. Thomas was both tortured and received life threatening injuries.
The Ohio Supreme Court has clarified the distinction between reviewing questions of manifest weight of the evidence and questions of sufficiency of the evidence. In State v. Thompkins
(1997), 78 Ohio St.3d 380, the court found that, in essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. at 386. In addition, a conviction based upon legally insufficient evidence is a denial of due process. Thompkins, supra, citing toTibbs v. Florida (1982), 457 U.S. 31, 45. As Justice Cook succinctly stated in the concurrence of Thompkins, a challenge to the sufficiency of evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. Courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.
Chapter 2971 of the Revised Code sets forth the parameters for the sentencing of sexually violent predators. R.C. 2971.01(H), the definitional section of the chapter, states in pertinent part:
As used in this chapter:
* * *
 (H)(1) "Sexually violent predator" means a person who has been convicted of or pleaded guilty to committing, on or after the effective date of this section, a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses.
 (2) For purposes of division (H)(1) of this section, any of the following factors may be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses:
 (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
 (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
 (c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.
 (d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.
 (e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victims's life was in jeopardy.
(f) Any other relevant evidence.
In the case sub judice, the state presented evidence that the appellant raped Ms. Thomas twice, cruelly ripped her apart either with his hand or a pipe/ratchet, beat her with the ratchet until she was severely injured and unconscious, and then left her alone in her blood and excrement. If believed, the evidence against the appellant would support a conviction for a sexually violent predator specification under R.C. 2971.01(H)(2)(d)(e) or (f).
The appellant's first assignment of error is overruled.
The second assignment of error:
II
 THE COURT'S FINDING OF GUILT OF THE SEXUAL MOTWATION SPECIFICATION WAS NOT SUPPORTED BY THE EVIDENCE.
The appellant asserts that his conviction for the sexual motivation specification on count three, felonious assault, was not supported by the evidence. The state argues that the appellant's vicious acts were motivated by a purpose to justify his sexual needs or desires.
As indicated in the first assignment of error, supra, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. Thompkins, supra.
R.C. 2971.01(K) defines "sexual motivation specification" as follows:
 (K) "Sexual motivation specification" means a specification, as described in section 2941.147
[2941.14.7] of the Revised Code, that charges that a person charged with a designated homicide, assault, or kidnapping offense committed the offense with a sexual motivation.
A designated assault includes a violation of R.C. 2903.11, felonious assault. R.C. 2971.01(B)(1). Sexual motivation means a purpose to gratify the sexual needs or desires of the offender. R.C. 2971.01(J).
Here, the appellant's convictions on the specifications are supported by sufficient evidence. If believed, the evidence that the felonious assault occurred in conjunction with the brutal raping of Ms. Thomas, and not as a separate isolated incident, is sufficient to support the conviction for the specification.
The appellant's second assignment of error is overruled.
The tenth assignment of error:
X
 THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A VERDICT OF GUILT ON TWO SEPARATE CHARGES OF RAPE.
In this assignment of error, the appellant argues that because Ms. Thomas testified that appellant "ripped the part between my vagina and my behind out" (T. 30-31), the event was described as one continuous act. The appellant asserts that it is not clear that there was actual penetration to the anal cavity.
As the appellee points out, the record refutes the appellant's assertions. Ms. Thomas testified that the appellant placed his fingers in her vagina without her permission or consent (T. 31) The appellant then went into the kitchen and came back with a pipe. At some point he either placed his fingers or the pipe in her anus and ripped her apart (T. 33). She believed that the appellant used his fingers, but there was a point in time where she was unconscious (T. 33). These acts meet the definition of sexual conduct as given in R.C. 2907.01(A). Sexual conduct is an element of rape. R.C. 2907.02. The Supreme Court has specifically found that entry into two bodily orifices constitutes two separate rape offenses. §§ State v. Barnes (1981), 68 Ohio St.2d 13.
This evidence, if believed, is sufficient under Thompkins, supra, to find the appellant guilty of two separate counts of rape.
The appellant's tenth assignment of error is overruled.
The third assignment of error:
III
 IMPROPER PROSECUTORIAL REMARKS DURING CLOSING ARGUMENT DENIED APPELLANT A FAIR TRIAL.
The appellant asserts that his conviction should be reversed based upon the following improper remarks of the prosecutor during closing argument: 1) "It amazes me over the years, the cases that we see, just when you think you have seen or heard everything, you see something that is more horrible, more shocking that what you have ever seen before." (T. 242-243); and,(2) "But one person Defendant-appellee and I use the term loosely Defendant-appellee that person, a human being, could cause this harm to another human being." (T. 243). The appellant asserts that these two comments left the jury with the impression that the prosecutor felt that appellant was an animal who had committed an unspeakable offense in the prosecutor's vast experience. The appellant characterizes these comments as a reflection of the prosecutor's personal opinion both as to the credibility of Ms. Thomas and the guilt of the appellant.
Instances of prosecutorial misconduct can be harmless when they are incidental and isolated. State v. Lorraine (1993),66 Ohio St.3d 414, 420. The conduct of the prosecuting attorney at trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial. State v. Loza (1994), 71 Ohio St.3d 61, and State v. Keenan (1993), 66 Ohio St.3d 402, citing to State v. Apanovitch (1987), 33 Ohio St.3d 19. Errors not objected to are waived, however, the closing argument must be reviewed in its entirety to determine if the prosecutor's remarks were prejudicial. Loza at 78 and Keenan at 410. Parties are granted great latitude in closing arguments, and the question as to the propriety of these arguments is generally considered one falling within the sound discretion of the trial court. Loza, supra,
citing to State v. Mauer (1984), 15 Ohio St.3d 239, 266. If it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the appellant guilty, then his conviction will not be reversed. Loza at 78.
This court notes that closing arguments are not evidence, but are intended only to advise the jury as to what counsel expects the evidence to show. See, also, State v. Turner (1993), 91 Ohio App.3d 153. The Supreme Court has found that the effects of any prosecutorial misconduct must be considered in the context of the entire trial, "one factor relevant to the due-process analysis is whether the misconduct was an isolated incident in an otherwise properly tried case." Kennan at 410.
In the case now before this court, the appellant failed to object to the statements made by the prosecutor, thus the appellant has waived all but plain error. The prosecutor's comments are not necessarily a reflection on the appellant, rather they were intended to acknowledge and to depict, in a few words, the horror and brutality of the crime committed against Ms. Thomas. Even assuming, arguendo, that the prosecutor's remarks were improper, by placing the statements back into the context of the entire closing argument, it is clear that the words of the prosecutor were not sufficient to deny the appellant a fair trial in an otherwise properly tried case.
The appellant's third assignment of error is overruled.
The fourth assignment of error:
IV
 EVIDENCE OF ALLEGED OTHER ACTS OF THE APPELLANT WERE INADMISSIBLE UNDER OHIO RULE OF EVIDENCE 404(B).
The appellant asserts that he was denied due process by the admission of other acts evidence in contravention of Evid.R. 404(B). The state argues that the appellant invited any error when he questioned Ms. Thomas on cross-examination regarding the appellant's propensity for violence.
This court has held that the admission of evidence of other crimes committed by a defendant can be highly prejudicial and is prohibited by Evid.R. 404(B). State v. Hartford (1984),22 Ohio App.3d 29. However, any objection to this evidence is waived where it is first brought out on cross-examination by a defendant's attorney. Id. When the door is opened on cross-examination, it is not error for other acts evidence to be admitted. State v. Dumas (March 10, 1994), Cuyahoga App. No. 64835, unreported.
The record before this court clearly demonstrates that the appellant's counsel questioned Ms. Thomas on cross-examination regarding her past violent relationship with the appellant. The state did no more than walk through a door opened by the appellant.
The appellant's fourth assignment of error is overruled.
The fifth assignment of error:
V
 THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
The appellant asserts that the testimony of Ms. Thomas was not credible because she chose to live in an unsafe environment and because she was motivated to prosecute the appellant to facilitate the return of custody of her children.
In Thompkins, supra, the Supreme Court illuminated its test for manifest weight of the evidence by citing to Black's Law Dictionary (6 Ed. 1990) at 1594:
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."
Thus, as the concurring opinion noted, when deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion. The only special deference given in a manifest weight review attaches to the conclusion reached by the trier of fact. Thompkins (Cook, J., concurring) citing to State v. DeHass (1967), 10 Ohio St.2d 230.
Ms. Thomas testified that the appellant, and no other, placed his hands in her vagina to see if she was "wet," threatened to kill her, placed either his hands or a pipe in her rectum, and brutally ripped her apart. Next, the appellant, and no other, broke both of her arms with a ratchet, beat her senseless, and then left her unconscious in an abandoned house. The weight of this evidence by the victim fulfilled the state's burden of persuasion.
The appellant's fifth assignment of error is overruled.
The sixth assignment of error:
VI
 THE TRIAL COURT ERRED IN NOT MERGING THE RAPE COUNTS AS ALLIED OFFENSES OF SIMILAR IMPORT.
The appellant argues that the multiple counts of rape should have merged and he should have been sentenced on only one count. The state asserts that each count of rape was committed separately and the trial court properly sentenced the appellant.
R.C. 2941.25 states:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
In State v. Jones (1997), 78 Ohio St.3d 12, the Supreme Court cited to State v. Blankenship (1988), 38 Ohio St.3d 116, and noted that the determination as to whether merger is appropriate pursuant to R.C. 2941.25, a two step analysis is required. In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must proceed to the second step. Id. The court continued and found that in the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds that either the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses. Jones,
citing to Blankenship. Additionally, the Supreme Court has specifically found that entry into two bodily orifices constitutes two separate rape offenses and a defendant may be convicted for both. Barnes, supra.
Here, while the elements of the rapes correspond, it is clear that the appellant may be convicted and sentenced on two separate counts of rape because he penetrated two separate orifices.
The appellant's sixth assignment of error is overruled.
The seventh assignment of error:
VII
 THE TRIAL COURT ERRED IN NOT AFFORDING APPELLANT A RIGHT TO ALLOCUTION.
The prosecution concedes that the appellant was sentenced without receiving the right to allocution as required under Crim.R. 32(A)(1). This court must remand for re-sentencing.Defiance v. Cannon (1990), 70 Ohio App.3d 821.
The appellant's seventh assignment of error is well taken.
The eighth and ninth assignments of error:
VIII
 THE TRIAL COURT FAILED TO COMPLY WITH R.C. 2929.19(B)(3)(b) AND (e)
IX
 THE TRIAL COURT ABUSED ITS DISCRETION IN IMPOSING MAXIMUM CONSECUTIVE SENTENCES.
These assignments of error are moot pursuant to App.R. 12. As determined in the seventh assignment of error, supra, the appellant is remanded for re-sentencing.
The appellant's eighth and ninth assignments of error are overruled as moot.
The appellant's conviction is affirmed. Case reversed and remanded for re-sentencing.
It is ordered that appellant recover of appellee his costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, P.J., and TIMOTHY E. MCMONAGLE, J., CONCUR.
 __________________________________ JAMES D. SWEENEY JUDGE