THE STATE OF OHIO, APPELLEE, *v.* KEENAN, APPELLANT.

[Cite as *State v. Keenan* (1993), 66 Ohio St.3d 402.]

(No. 91–438—Submitted January 13, 1993—Decided June 16, 1993.)

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Carmen M. Marino,* Assistant Prosecuting Attorney, for appellee.

*James Kura,* Ohio Public Defender, *Kevin L. Fahey* and *Jane P. Perry,* Assistant Public Defenders, for appellant.

MOYER, C.J.

## I

In his second proposition of law, Keenan complains of misconduct by the Assistant Prosecuting Attorney during the guilt-phase closing argument. This proposition has merit. "The conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial." *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400. Thus, although we have "express[ed] our mounting alarm over the increasing incidence of misconduct * * * in capital cases," we have not treated prosecutorial misconduct as reversible error "except in rare instances." *State v. DePew* (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d 542, 556. This case presents an aggravated example of such misconduct. Here, we find that the prosecutor's pattern of misconduct throughout much of the trial and during closing argument did deprive the defendant of a fair trial.

### A

### DEFENSE COUNSEL OPINIONS

The prosecutor argued to the jury during the guilt phase that defense counsel's conduct of the case showed that they were "not looking at this objectively. They are paid to do that. They are paid to get him off the hook." A defense objection was overruled.[1] In our view, this comment imputed insincerity to defense counsel, thus suggesting that they believed Keenan guilty. It was therefore improper. Balske, Prosecutorial Misconduct During

---

1. This was the only error preserved by an objection at the closing argument of the guilt phase. While Keenan made other objections to the prosecutor's closing argument, we find no merit in them.

Closing Argument (1986), 37 Mercer L.Rev. 1033, 1055–1056; Gershman, Prosecutorial Misconduct (1985) 10–29, Section 10.4(b). Such comment is forbidden because it is both irrelevant and prejudicial. The prosecutor's rebuttal argument insinuated even more strongly that defense counsel thought Keenan guilty: "Not once did they tell you their client was innocent. Not once did they tell you to find him not guilty." The personal opinion of defense counsel of their client's guilt or innocence is no more relevant than the opinion of the prosecutor. Yet, if the jury believes that even the defendant's own advocates think him guilty, that belief will naturally carry great weight in their deliberations. The jury is also likely to resent defense counsel's perceived insincerity.

Moreover, the jury is likely to believe a prosecutor's suggestion that defense counsel are mere "hired guns." The prosecutor carries into court the prestige of "the representative * * * of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest * * * is not that it shall win a case, but that justice shall be done. * * * Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States* (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321.

## B

## DENIGRATION OF DEFENSE COUNSEL

The prosecutor compounded his error by disparaging defense counsel, in the jury's presence, for objecting. The prosecutor said: "Well, I certainly object. It's argument. We don't want him off the hook."

It is improper to denigrate defense counsel in the jury's presence for making objections. Such conduct infringes on the defendant's right to counsel and penalizes him for attempting to enforce procedural rights. Cf. *State v. Wiles* (1991), 59 Ohio St.3d 71, 88, 571 N.E.2d 97, 118; see, generally, Gershman, *supra*, at Sections 10.4 and 10.4(a). In light of Ohio's contemporaneous-objection requirement, such conduct is especially reprehensible.

Yet the prosecutor repeatedly chose to attack the defense for objecting. At one point, this exchange occurred before the jury:

"MR. SHAUGHNESSY: We'll object, your Honor.

"THE COURT: Overruled.

"MR. MARINO: Yes, we'll object. Did we object to Adam [*sic*] Klann being killed? We'll object. * * *"

Later, the prosecutor derided defense counsel for having objected during Nancy Somers's testimony: "Objection. Yes. We don't want to hear that because that answer means, yes, he agrees with the murder of an innocent human being."

## C

## APPEAL TO EMOTION

The prosecutor consistently substituted emotion for reasoned advocacy in his closing arguments. He expressly encouraged the jury to react emotionally to the evidence, specifically the gruesome photographs of Klann's corpse. "When you see what has been done to him, then you will know the outrage that we feel over it, that it is justifiable." Though the prosecutor added, "That is not meant to sway your sympathy or feelings," the issue here is the effect his conduct actually had on the jury, not the effect it was meant to have. See *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87 (the issue "is the fairness of the trial, not the culpability of the prosecutor").

The prosecutor soon adverted again to the photographs:

"So that you understand how the law enforcement community and people like me and Mr. Allen feel about this, I want you to look at these photographs. I'm going to show them to you for a few seconds so that when I talk to you in the next 30 or 40 minutes you're going to understand just exactly what this case is about.

"That was once a living human being. * * * If it bothers you, then you are a moral, decent person. If the defense trys [*sic*] to tell you that was done to inflame you, you should say any person meeting their death like Anthony Klann did would inflame any decent citizen's feelings, emotions and morals."

Again the prosecutor referred to the photographs: "You will understand more fully that this is a capital case when you look at that photograph and the other photographs of Mr. Klann and you look at the knife." Finally, the prosecutor said: "When you see those pictures you'll dream about it. They will not leave your memory. When you recount the facts of this case you will be shocked. You will be upset, at least as upset as I am, at least."

Although gruesome photographs may be admissible in a capital case, the state may not use them "to appeal to the jurors' emotions and to prejudice them against the defendant." *State v. Thompson* (1987), 33 Ohio St.3d 1, 15, 514 N.E.2d 407, 420. Such photographs "are charged with such immediacy and emotional impact," *State v. Benner* (1988), 40 Ohio St.3d 301, 311, 533 N.E.2d 701, 712, fn. 2, that they inherently present some danger of inflaming

the jury in any case; that is why we have insisted, as a prerequisite to admissibility, that each gruesome photograph have a probative value that outweighs its prejudicial effect. See *State v. Morales* (1987), 32 Ohio St.3d 252, 257–258, 513 N.E.2d 267, 273–274; cf. Evid.R. 403.

Assuming the photographs were admissible, the prosecutor focused not on what the photographs proved, but on the "feelings" and "emotions" they evoked. Worse, he encouraged the jurors to regard those feelings as relevant—indeed, central—to their task. In the prosecutor's argument, the role of the photographs was not evidentiary; it was visceral.

The prosecutor's reliance on emotion did not stop there. At one point, the prosecutor actually stabbed a large knife into a counsel table in the presence of the jury. He urged the jury to "stand there just like * * * Anthony Klann was made to stand there when those two men * * *, who were well over six foot, then remember those two men, and then remember Mr. Espinoza, as this man made him put his * * * head back and sliced open his neck. That's our society. That's our presumption of innocence."

After describing Keenan's alleged acts, the prosecutor asked: "That's a human being?" Answering his own question, he called Keenan an "animal." Such invective is not unfair *per se*, see *Darden v. Wainwright* (1986), 477 U.S. 168, 180–183, 106 S.Ct. 2464, 2471–2472, 91 L.Ed.2d 144, 156–158; *Wiles, supra*, 59 Ohio St.3d at 87, 571 N.E.2d at 117, but here the epithet added to the emotional smoke screen surrounding the prosecutor's entire argument.

## D

## PERSONAL OPINION

The prosecutor spoke of his personal outrage. He told the jury: "And yes, I'm burned. I'm burned in that same * * * six letter word that Espinoza used. * * * In my time I haven't got emotional too often but it's genuine." Finally, he said: "I'm all talked out for now, but you better believe what I told you was heartfelt, was true to these facts, was exactly how me and my friend, [Detective] Allen * * * feel about this case." A prosecutor may not express his personal opinion about the guilt of the accused, unless he bases that opinion on the evidence presented in court. Here, the prosecutor made only glancing reference to the "facts" of the case; this comment was really about the state of his own emotions and the fervor with which he believed in Keenan's guilt.

To be sure, any capital trial generates strong emotions. Furthermore, we agree with Judge Learned Hand's observation that "the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be

appropriate in a lecture, while the defense is allowed those appeals in misericordiam [*sic*] which long custom has come to sanction." *United States v. Wexler* (C.A.2, 1935), 79 F.2d 526, 530. And so we have consistently held the prosecution entitled to "some latitude and freedom of expression" in summation. *State v. Woodards* (1966), 6 Ohio St.2d 14, 26, 35 O.O.2d 8, 14, 215 N.E.2d 568, 578. Realism compels us to recognize that criminal trials cannot be squeezed dry of all feeling.

But it does not follow that prosecutors may deliberately saturate trials with emotion. We have previously announced that "a conviction based solely on the inflammation of fears and passions, rather than proof of guilt, requires reversal." *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 17, 490 N.E.2d 906, 911. Excessively emotional arguments may deny due process. In our view, the prosecutor's histrionic approach to this case crossed the line that separates permissible fervor from a denial of a fair trial.

## E

## BAD CHARACTER

The prosecutor made another gravely improper argument when he used the bad character of Keenan's friends to attack Keenan's own character. Discussing the testimony of Paul Lewis, the prosecutor said: "[Y]ou have Paul Lewis, who is Stoney, and there is no question in my mind that * * *, as Mr. Shaughnessy suggested, he had been stoned a few times, but he is this man's [Keenan's] acquaintance * * *. That tells you something about this man. Tell me who your friends are and I'll tell you what you are like." Likewise, the prosecutor reminded the jury that Keenan was "the employer of [Espinoza and D'Ambrosio]. You want those two men working for you? This man does."

In relying on the "thoroughly discredited doctrine" of guilt by association, the prosecutor violated "a fundamental principle of American jurisprudence, inhabiting a central place in the concept of due process." *People v. Chambers* (1964), 231 Cal.App.2d 23, 28–29, 41 Cal.Rptr. 551, 555. A defendant cannot be adjudged guilty on the ground that he or she associates with bad people. Such arguments are highly prejudicial. *United States v. Labarbera* (C.A.5, 1978), 581 F.2d 107, 109.

By arguing explicitly that the bad character of Keenan's friends reflected on Keenan's character, when that character was wholly irrelevant, the prosecutor ignored the fact that "[u]nder longstanding principles of Anglo–American jurisprudence, an accused cannot be convicted * * * by proving he * * *

is a bad person." *State v. Jamison* (1990), 49 Ohio St.3d 182, 184, 552 N.E.2d 180, 183.

## F

## PREJUDICIAL ERROR

Having held the prosecutor's behavior improper, we must determine whether it constituted a denial of due process. We consider the effect the misconduct had on the jury in the context of the entire trial. See *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 643–645, 94 S.Ct. 1868, 1871–1872, 40 L.Ed.2d 431, 436–438; *Darden v. Wainwright, supra,* 477 U.S. at 181–182, 106 S.Ct. at 2471–2472, 91 L.Ed.2d at 157–158.

One factor relevant to the due-process analysis is whether the misconduct was an isolated incident in an otherwise properly tried case. See *Donnelly,* 416 U.S. at 645, 94 S.Ct. at 1872, 40 L.Ed.2d at 438. That was not true here. To the contrary, the prosecutor's errors were part of a protracted series of improper arguments, "a textbook example of what a closing argument should not be." *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 493, 433 N.E.2d 561, 566.

The defense did not object to most of the prosecutor's improper remarks; nonetheless, all such remarks are relevant to our due-process analysis. We have held that error not objected to is waived on appeal. However, we have also said: "The closing argument must * * * be reviewed in its entirety to determine if the prosecutor's remarks were prejudicial." *State v. Moritz* (1980), 63 Ohio St.2d 150, 157, 17 O.O.3d 92, 97, 407 N.E.2d 1268, 1273. Moreover, the state here is in no position to claim waiver after the prosecutor attacked the defense for objecting. Having poisoned the well, the prosecution cannot now complain that the defense refused to drink from it. Thus, even though the defense waived objection to many remarks, those remarks still form part of the context in which we evaluate the effect on the jury of errors that were not waived.

As the foregoing discussion shows, the prosecutor's conduct consists of much more than trivial errors. We have searched in vain for other factors that might indicate lack of prejudice. The trial court gave no curative instruction, see *Donnelly v. DeChristoforo, supra,* 416 U.S. at 645, 94 S.Ct. at 1872, 40 L.Ed.2d at 438; indeed, it overruled an objection, giving the prosecutor's comment its approval in the jury's eyes. Nor was the comment an invited response to anything said by the defense. Cf. *Darden,* 477 U.S. at 182, 106 S.Ct. at 2472, 91 L.Ed.2d at 158.

Finally, the evidence here was not overwhelming. Espinoza, the sole eyewitness to the murder, had participated in the crime. Facing the death

penalty for aggravated murder, he pled guilty to voluntary manslaughter and other noncapital crimes pursuant to a plea agreement; testifying was his end of the bargain. Moreover, Espinoza himself admitted past quarrels with Klann, and the way he treated Klann at Coconut Joe's made his feelings clear.

Credible evidence contradicts Espinoza's testimony that Klann was kidnapped during the search for Lewis and killed because he did not tell Keenan where Lewis was. Espinoza and Lewis testified that the night of Klann's kidnapping was "Tequila Night" at Coconut Joe's. They thought this was a Friday, but the bar's employees testified that Coconut Joe's always held "Tequila Night" on Thursdays, and this testimony was unshaken on cross-examination. Also, Espinoza testified that it was raining when Keenan picked up Klann in the truck, early in the morning. According to the NWS statement, it rained in the Cleveland area in the early hours of Friday morning, but not at all on Saturday. Although Espinoza, Carolyn Rosell, and three other witnesses testified that Keenan looked for Lewis on Friday night, Espinoza and Rosell conceded that it could have been Thursday night, while the others seemed to have trouble recalling dates in general.

Thus, substantial evidence suggests Keenan's search for Lewis took place on Thursday night-Friday morning, September 22–23. Yet the coroner concluded that Klann probably died on Saturday morning, September 24, and in any case well after 8:15 a.m. Friday, September 23. This tends to refute Espinoza's account of the murder, weakening the state's case.

Espinoza also claimed that when police came to his apartment on September 26, Keenan fled. But the state never explained how Keenan could have escaped with Detective Allen at the apartment door and the building surrounded by eight officers.

Without overwhelming evidence of guilt, we cannot know what the verdict might have been had not the prosecutor clouded the jury's vision with improper tactics. Cf. *Darden*, 477 U.S. at 182, 106 S.Ct. at 2472, 91 L.Ed.2d at 158. To declare as nonprejudicial the conduct of the assistant prosecutor in this case would be to announce a new standard for the prosecution of death penalty cases—a standard that falls dramatically short of that which is guaranteed to any person accused of a capital crime by both the Ohio and United States Constitutions.

## II

In his fifth proposition of law, Keenan complains that the prosecution improperly impeached its own witness, Adam Flanik, with a prior inconsistent statement, violating Evid.R. 607. This proposition of law also has merit.

Flanik testified that he saw D'Ambrosio holding Klann in Keenan's truck at knifepoint. The prosecutor asked if Klann was crying. Flanik replied: "It

seemed like it, but I really couldn't tell." "Q. If I show you your statement, would that refresh your recollection?" "A. I guess." The prosecutor handed Flanik a copy of his statement to police. After Flanik reviewed it, the prosecutor again asked, "Was he crying?" "A. I couldn't really tell." "Q. Did you tell the police he was crying in your statement here?" After rereading the statement, Flanik answered: "Yes."

Under Evid.R. 607, a party may not impeach its own witness with a prior inconsistent statement without showing surprise and affirmative damage. The prosecutor's use of Flanik's statement violated this rule. Flanik did not cause affirmative damage by testifying that he "couldn't tell" whether Klann was crying; such a "neutral answer," Staff Note to Evid.R. 607, provides no basis for impeachment.

Nor can we accept the state's argument that Flanik's statement was admissible as "past recollection recorded." That doctrine does not apply unless the witness "has insufficient recollection to enable him to testify fully and accurately." Evid.R. 803(5). Flanik did not testify that he could not remember whether Klann was crying; rather, he testified that he "couldn't really tell." What Flanik did not remember was whether he *told police* Klann was crying. (The state also attempts to apply the "present recollection refreshed" doctrine, but that doctrine does not allow a party to bring an out-of-court statement before the jury. See *State v. Scott* [1972], 31 Ohio St.2d 1, 5–6, 60 O.O.2d 1, 3, 285 N.E.2d 344, 347–348.) We conclude that the prosecutor violated Evid.R. 607.

Alone, such a violation might have been harmless; here, we believe it contributed to the unfairness of Keenan's trial. The fact that Klann was crying was but marginally relevant to the kidnapping charge, yet it had considerable emotional impact [2]—impact intensified by the prosecutor's plea that the jurors envision themselves in Klann's place. In the emotional atmosphere the prosecutor created with his closing arguments, we doubt the jury could properly evaluate the information that Klann was crying. We therefore find the violation of Evid.R. 607 prejudicial error.

### III

On this record, we do not believe Keenan received a fair trial. The judgments of conviction cannot stand. Accordingly, we sustain Keenan's

---

2. The prosecutor must have badly wanted the jury to hear that Klann was crying, despite the quite limited relevance of that fact; he rephrased his questions to Flanik several times, trying to meet defense objections and extract the answer he wanted. His persistence illustrates the statement's high potential for prejudice.

second and fifth propositions of law, reverse the judgment of the court of appeals upholding his convictions, and remand the cause to the Cuyahoga County Court of Common Pleas for further proceedings consistent with this decision.

*Judgment reversed*
*and cause remanded.*

A.W. SWEENEY, DOUGLAS, WRIGHT and F.E. SWEENEY, JJ., concur.

RESNICK and PFEIFER, JJ., dissent.

PFEIFER, J., dissenting. I would affirm both the defendant's convictions and the imposition of the death sentence. The prosecutorial conduct in the trial did not rise to the level of reversible error. Both defense counsel and prosecutor were afforded wide latitude to present their arguments. All attorneys took full advantage of this freedom during the Keenan trial.

The majority narrowly focuses on the behavior of the prosecutor and has failed to acknowledge that the defense counsel was also permitted to argue his case in an aggressive and arguably prejudicial manner. In closing arguments, one of the appellant's defense counsel continually branded Edward Espinoza, the key prosecutorial witness, as a "piece of garbage." The same defense counsel also shared his own opinion of Espinoza's credibility by asking the question "Is he believable?" and then answering "No."

The defense counsel's conduct did not end when he concluded his evaluation of Mr. Espinoza. He told the jury of his own personal disagreement with the expert opinion of Dr. Elizabeth Balraj, the coroner who performed an autopsy on the victim. In closing arguments, defense counsel commented that *"I think I can disagree with Dr. Balraj* without being disagreeable." (Emphasis added.) Later, the same attorney reinforced his evaluation of the expert by adding, "I disagree with the lady." A defense attorney lacks any foundation to personally evaluate a medical doctor's opinion.

In the heated atmosphere of a capital offense trial, one of the trial judge's most important responsibilities is to make sure that the state and the defense are trying the case on the same field. In this case, Judge Michael J. Corrigan fulfilled his responsibility by providing each side with an opportunity to present its case forcefully.

In a vacuum, the prosecutor's behavior could have constituted prosecutorial misconduct severe enough to warrant reversal. However, the leeway that Judge Corrigan gave to the prosecutor was also given to the defense counsel. By overturning the appellant's conviction on the grounds of prosecutorial misconduct, this court is sending a strong message to the bench and bar.

Prosecutors must now try these ugly cases handcuffed by the demand of dispassionate presentation. Defense counsel remain entitled to argue with no holds barred.

Second, the prosecutor did not impeach his own witness as the majority has alleged. After being asked if the victim had been crying, the state's witness, Adam Flanik, responded, *"It seemed like it,"* and then added the qualification "but I really couldn't tell." (Emphasis added.) In general, this is an affirmative response to the prosecutor's question. The subsequent questioning by the prosecutor merely tried to elicit a clearer, more affirmative response from Flanik. Because the prosecutor never attempted to directly contradict the testimony of his witness, no impeachment occurred. To hold that any attempt by an attorney to obtain a more definitive response from his witness constitutes impeachment is a dangerous precedent.

Finally, this jury, on the facts presented, properly convicted Keenan and sentenced him to die. Keenan's murder of Anthony Klann was cold-blooded mayhem. The jury knew it. The trial judge knew it. The prosecutor's conduct did not change the inevitable outcome of this trial.

RESNICK, J., concurs in the foregoing dissenting opinion.