The STATE of Ohio, Appellee,

v.

SMITH, Appellant.

[Cite as *State v. Smith* (2000), 139 Ohio App.3d 398.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 76582.

Decided Sept. 18, 2000.

*William D. Mason*, Cuyahoga County Prosecuting Attorney, and *James A. Gutierrez*, Assistant Prosecuting Attorney, for appellee.

*Jonathan Garver*, for appellant.

PORTER, Judge.

Defendant-appellant Rodnie Smith appeals from his convictions following a jury trial on twenty-five counts of financial crimes and frauds arising from his alleged role in organizing a scheme that used false identifications to obtain goods and services. Defendant contends that the RICO statute (R.C. 2923.32) violates the Due Process Clause of the United States Constitution because it imposes strict culpability without criminal intent. Defendant also contends that prosecutorial misconduct deprived him of due process and that the sentences imposed were contrary to law. We find this appeal has merit in part and vacate defendant's sentence and remand for resentencing.

On December 21, 1998, defendant was indicted on twenty-five counts, including one count of RICO/engaging in a pattern of corrupt activity (R.C. 2923.32), four separate counts of theft (R.C. 2913.02), four separate counts of tampering with records (R.C. 2913.42), ten separate counts of unauthorized access to a computer (R.C. 2913.04), and six separate counts of forgery (R.C. 2913.31).

Trial commenced on May 7, 1999. On May 11, 1999, the jury returned guilty verdicts on all twenty-five counts. On May 13, 1999, the defendant was sentenced to a total of nine years' imprisonment.

The state's case revolved around defendant's role in a pattern of corrupt activity. The state claimed that defendant organized various individuals into defined roles to further his financial scheme. This activity spanned a period from

April 1998 to September 1998. The state contended that defendant organized a crime ring to participate in the thefts of four victims' identities for the purpose of using the victims' stolen identities to criminally procure goods and services.

The state's evidence at trial disclosed that defendant enlisted the help of several co-defendants: co-defendant Ron Brown, Jr., who ran computer credit checks on potential victims; co-defendant Tameka May, who put defendant in contact with a Bureau of Motor Vehicles employee; co-defendant Kimberly Tatum, the BMV employee who created fraudulent driver's licenses; and defendant's girlfriend, co-defendant Shashanna Rea, who went to various vendors and procured the goods and services using the false identifications. Defendant received all the profits from the goods and services obtained and paid the co-defendants out of the proceeds. The state contended that the evidence showed that defendant was the ringleader/hub of this illegal enterprise.

Co-defendant Shashanna Rea testified extensively to her relationship with defendant. They met in 1998 during her visit to Cleveland from Minnesota. At that time, she was eighteen years old. After this encounter, they maintained a relationship on the phone. During this time, defendant asked Shashanna to carry drugs to California for a $2,000 fee. Although this trip did not occur, she did travel to Cleveland with a ticket bought by defendant. During this stay, she lived with defendant and completely relied on him for support.

Shashanna was not initially involved in any criminal activity. Then, defendant informed her that he knew someone at Allied Mortgage who could get the credit reports of people with good credit. He also knew someone at the license bureau who could provide them with fake identification cards to match up with the people on the credit reports. With these identification cards they could apply for instant credit on which they could charge merchandise.

Defendant taught Shashanna to analyze credit reports and select innocent victims with excellent credit ratings. Once selected, defendant and Shashanna went to the Bureau of Motor Vehicles. With the help of co-defendant Kimberly Tatum, they obtained identification cards. Kimberly Tatum was paid by defendant for her role in this illegal activity. Once in possession of these identification cards, Shashanna engaged in illegal activity throughout Cleveland at the direction of defendant. Their practice was to open checking accounts, apply for instant loans, and purchase cell phones and jewelry—creating substantial debt in the victims' names with the false identification cards. Although they engaged in most of these thefts together, defendant was the one who primarily profited from their activities as Shashanna received none of the proceeds from defendant's reselling of these items.

Co-defendant Ron Brown testified that he worked at Allied Mortgage Company. He had access to a computer system to run credit checks on individuals. In

June 1998, defendant approached Brown and asked him to run credit checks for defendant's personal use. Defendant provided the names for these credit checks. Brown also ran credit checks on all four victims at the direction of defendant. Brown received monetary compensation for his role. Brown also saw defendant in possession of the identification cards of victims Steve Harmon and Kenneth Lance.

John Boyle, an employee of Factual Data Credit Reporting Agency, explained how the computer system installed at Allied Mortgage ran credit reports. He analyzed a log of credit reports run by co-defendant Ron Brown at Allied Mortgage. The eventual victims' names, Lisa Ambrose, Amy Jo Sutterleuty, Steve Harmon, and Kenneth Lance, were all processed through the credit check program installed at Allied Mortgage.

Co-defendant Tameka May testified that in May 1998, defendant approached her and asked her if she knew anyone who could provide him with fake identification cards. She put defendant in contact with Kimberly Tatum, a clerk at the Bureau of Motor Vehicles. She then went to the Bureau of Motor Vehicles with defendant and Shashanna Rea. Once there, Tameka May put defendant in contact with Kimberly Tatum. Defendant paid Tameka May between $400 and $500, which she split with Kimberly Tatum.

The four victims of this identity fraud were Lisa Ambrose, Amy Jo Sutterleuty, Kenneth Lance, and Steve Harmon. They each testified as to the impact of this criminal activity on their lives. At no time did any of these victims give permission to defendant to use their identities to establish fraudulent identifications or to create debt in their names. The stores and businesses where false debt was created included, but were not limited to, Zale's Jewelry, Kay's Jewelers, Radio Shack, American Express, GTE Wireless, Ameritech Mobile Communications, and American General Finance.

Michael Russo, lead investigator for the Bureau of Motor Vehicles, identified the duplicate state identification cards obtained. Acting with detectives from Cleveland and Fairview Park, these three agencies discovered defendant's theft ring. It was during Michael Russo's interview of Shashanna Rea that they discovered the details of defendant's scheme. She named all the individuals involved that defendant hired and explained their individual roles, including defendant's role as the ring leader. Russo also discovered that defendant had established a fraudulent post office box in an attempt further to conceal his illegal activity. In leasing the mailboxes, he used the names of the victims.

We will address defendant's assignments of error in the order presented.

"I. R.C. 2923.32 violates the Due Process Clause of the U.S. Constitution because it imposes strict liability."

■ It has been a long-settled principle that all legislative enactments enjoy a presumption of constitutionality and therefore courts at all levels apply all presumptions and rules of construction as to uphold, if feasible, a statute or ordinance that is challenged as unconstitutional. *State v. Dorso* (1983), 4 Ohio St.3d 60, 61, 4 OBR 150, 150–151, 446 N.E.2d 449, 450–451.

The defendant, relying on federal case law, challenges the constitutionality of R.C. 2923.32, the state RICO statute, because it imposes strict liability—culpability may be more accurate—without proof of a mens rea or criminal intent. This precise challenge has been raised and decided by the Ohio Supreme Court in *State v. Schlosser* (1997), 79 Ohio· St.3d 329, 681 N.E.2d 911, which specifically upheld the strict liability issue as constitutional. The court held:

"We find * * * that the plain language of the statute, the legislative intent and public policy considerations behind the statute, and the varying culpable mental states necessary for the predicate offenses, unequivocally indicate a purpose to impose strict liability for the conduct described in the section. * * * We agree that a statute may provide criminal liability without a mens rea consistent with due process if it is a regulatory measure in the interest of public safety." *Id.* at 331–332, 334, 681 N.E.2d at 913, 915. See, also, *State v. Rice.* (1995), 103 Ohio App.3d 388, 659 N.E.2d 826; *State v. Haddix* (1994), 93 Ohio App.3d 470, 638 N.E.2d 1096; *State v. Sanchez* (June 9, 1994), Cuyahoga App. No. 62797, unreported, 1994 WL 258667, which also upheld the constitutionality of R.C. 2923.32 concerning the issue of strict liability.

Given these authorities, we conclude that there is no merit to defendant's Assignment of Error I. It is overruled.

"II. Prosecutorial misconduct in closing argument violated the appellant's right to due process under the Fourteenth Amendment of the U.S. Constitution."

We find no merit to this assignment of error.

■ A prosecuting attorney's conduct during trial does not constitute a ground for error unless the conduct deprives the defendant of a fair trial. *State v. Keenan* (1993), 66 Ohio St.3d 402, 405, 613 N.E.2d 203, 206–207; *State v. Gest* (1995), 108 Ohio App.3d 248, 257, 670 N.E.2d 536, 542–543. The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips* (1982), 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78. The effect of the prosecutor's misconduct must be considered in light of the whole trial. *State v. Durr* (1991), 58 Ohio St.3d 86, 94, 568 N.E.2d 674, 682–683; *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402–403, 473 N.E.2d 768, 792–793.

In the case at bar, the defendant cites two excerpts of the prosecutor's closing arguments and contends that the comments were improper and prejudicial but does not explain why.

In this case, the prosecutor, in his final closing argument, made the following remarks that defendant claims to be improper:

"[W]hat he [defense counsel] wants to do is shift your attention away from really what are the issues of trial, he wants to stop you from thinking really what is happening here, and to be honest with you, a lot of that happened with Tameka May when he cross-examined her. I'd like to call this tricks of the trade."

Later, the prosecutor argued:

"Was there any evidence to contradict what happened here? None, ladies and gentleman.

"* * *

"I don't know what happened to this merchandise. I wish I had. What does it matter? That's another one of these red herrings he wants you to think about."

The trial court overruled the defendant's objections to these comments.

A review of the record reveals a lack of merit to defendant's contentions. The argument to which defendant objects was a comment by the state on the defense's attempt to shift the blame to the state's witnesses, and the latter comment pointed out that the evidence produced was not contradicted by anyone. The last alleged improper comment again merely stated that the defense was trying to lead the jury away from the relevant issues.

We find that the comments on the evidence were not improper and in no way prejudicially affected the substantial rights of the defendant. *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 299–300; *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883. A prosecutor is afforded wide latitude in closing arguments, *State v. Benge* (1996), 75 Ohio St.3d 136, 141, 661 N.E.2d 1019, 1025–1026; *State v. Jacks* (1989), 63 Ohio App.3d 200, 210, 578 N.E.2d 512, 518–519, and it is within the trial court's sound discretion to determine whether a comment has gone too far. The record in this case demonstrates that the trial court, in its discretion, determined that the comments were within proper bounds. *State v. Benge, supra,* at 141, 661 N.E.2d 1019, 1025–1026. We see no abuse of discretion in these rulings.

Assignment of Error II is overruled.

"III. The sentence imposed by the trial court is contrary to Ohio law."

■ Defendant contends that the sentence imposed by the trial court was not in accordance with R.C. 2929.14(B) regarding minimum sentences and 2929.14(E)(4) regarding consecutive sentences.

In the case herein, the record indicates that the defendant has no prior record. R.C. 2929.14(B) states:

"[I]f the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender and if the offender previously has not served a prison term, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."

The Ohio Supreme Court considered in *State v. Edmonson* (1999), 86 Ohio St.3d 324, 326, 715 N.E.2d 131, 133–134, the requirements of this statute and held:

"We construe this statute [R.C. 2929.14(B)] to mean that unless a court imposes the shortest term authorized on a felony offender who has never served a prison term, the record of the sentencing hearing must reflect that the court found either or both of the two statutorily sanctioned reasons for exceeding the minimum term warranted the longer sentence.

"R.C. 2929.14(B) does not require that the trial court give its *reasons* for its finding that the seriousness of the offender's conduct will be demeaned or that the public will not be adequately protected from future crimes before it can lawfully impose more than the minimum authorized sentence. By contrasting this statute with other related sentencing statutes, we deduce that the verb 'finds' as used in this statute means that the court must note that it engaged in the analysis and that it varied from the minimum for at least one of the two sanctioned reasons." (Emphasis *sic*.)

In the case herein, the trial court stated:

"The Court's prepared to pass sentence pursuant to 2929.12, 13, 14 all the provisions related thereto.

"The Court finds this to be a very serious offense. These are not random theft cases. It's an organized theft, an organized pattern of conduct.

"The Court finds the State's witnesses to be credible. The Defense witnesses had nothing of substance to do with the case. So the Court makes no judgment regarding them. They have established that you are a thief, and you're the one who organized this pattern of activity. * * *

"What was reprehensible was that you used some of these individuals who were like minded, and some of them certainly I would agree are not perfect individuals, and have criminal backgrounds themselves, and anything less than perfect motivation, but your worst aspect of the crime though is your recruiting an 18 year old girl to do your high risk work for you, where you send her in to get I.D.'s and send her in to get credit, and send her in to get the loan from the mortgage companies, and then she comes out, while you stay safely in the parking lots, taking her from place to place."

Although, like in *Edmonson*, some of the remarks made by the trial court might be argued to support a finding that the minimum sentence would demean the seriousness of defendant's conduct or that the public would not be adequately protected from his future crimes, the trial court did not specify either of these reasons listed in R.C. 2929.14(B) as supporting its deviation from the minimum sentence. Therefore, we vacate and remand the sentencing so that the trial court can elicit the reasons for not imposing the minimum sentence in this case.

Furthermore, R.C. 2929.19(B)(2)(c) requires the trial court to make a finding that gives its reasons for selecting the sentence imposed if it imposes consecutive sentences. In this regard, R.C. 2929.14(E)(4) states:

"If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

"(a) The offender committed the multiple offense while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

"(b) The harm caused by multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.

"(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

In the case herein, the trial court failed to make the requisite findings to support a consecutive sentence. The trial court merely stated, "The Court is going to impose consecutive sentences on Counts 6, 9, 12 and 16." R.C. 2929.14 requires the court to make a finding that the consecutive sentences are necessary to protect the public from future crime or to punish the offender and that such

consecutive sentences are not disproportionate to the seriousness of the offender's conduct and the danger posed to the public, and that harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses adequately reflects the seriousness of the conduct. Because this was not done in this case, we remand this matter to the trial court for resentencing of the defendant and the inclusion of such a finding if the court, in its discretion, decides to impose consecutive sentences in this matter.

Assignment of Error III is sustained.

*Judgment affirmed in part,*
*sentence vacated*
*and cause remanded for resentencing.*

JAMES D. SWEENEY, P.J., and BLACKMON, J., concur.