OPINION
Michael Stroud was found guilty after a trial by jury of murder — R.C. 2903.02(B) — and a firearm specification to the murder charge. He also pleaded guilty to having weapons under disability. He was sentenced to consecutive sentences of fifteen years to life (murder), one year (weapons under disability), and three years (firearm specification). Stroud advances three assignments of error on appeal.
 1. DEFENDANT-APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
The State's evidence tended to establish that Stroud fatally injured Alton Smith as Stroud fired several bullets from the street in Smith's direction as Smith sat on a porch in front of 3119 Haberer Avenue. Stroud's evidence tended to establish self-defense. The jury rejected Stroud's claim of self-defense. Our task is to determine whether the jury clearly lost its way in resolving the conflicting evidence so as to create a manifest miscarriage of justice that mandates reversal of Stroud's convictions and a new trial. State v. Tompkins (1997),78 Ohio St.3d 380, 387.
Four of the State's witnesses — Takiesha Hampton, Angela Douds, Leona McGlown, and Karen White — provided generally consistent testimony that presented the following scenario.
Stroud had had a relationship with Hampton that had produced a five-year-old child, and Stroud had lived with Hampton at her home at 3119 Haberer until shortly before July 30, 1999, when the shooting occurred during the early morning hours. Approximately two weeks before the shooting, Hampton had met Smith, whom she had seen socially on a few occasions during that two weeks, and who was visiting her during the late evening of July 29 and early morning of July 30.
During the time that Smith was visiting, he was on Hampton's front porch socializing with her and others. Stroud appeared on the scene three times while Smith was present. It was evident that Stroud harbored hostile feelings toward Hampton and Smith. As he left the second time, Stroud made threats variously recalled as "I'll shoot that fat bitch" (meaning Smith or Hampton), recalled by Hampton; "I'll shoot you and that nigger (Smith)" to Hampton, recalled by Douds; and "Don't lose your life tonight" (to Hampton), recalled by Karen White.
When Stroud appeared the third time, he left his car running in the middle of the street. Stroud approached Smith, who was sitting in a chair on Hampton's porch, and Smith told Stroud "I didn't come over here for no trouble," or "I don't need no trouble and be threatening me," after which Stroud angrily returned to his car, withdrew a firearm through the driver side window, turned and fired several shots at Smith, one of which hit Smith in the right temple, mortally wounding him. Stroud left in his car.
Smith had not been armed, and he had not threatened Stroud.
Other State's evidence established that when Stroud's car was recovered less than a day after the shooting, it had no bullet holes; that when Stroud was arrested eight months later, he told the arresting officer he was tired of running; that six bullet casings from the same semi-automatic weapon were found in the street outside 3119 Haberer; that three recovered bullets came from the same type weapon; that Smith's hands were greasy and dirty; that on July 29, Smith had done asphalt work and replaced a transmission in one of his race cars, and that Smith was right-handed.
Stroud presented two eyewitnesses and the results of an atomic absorbtion test to establish his defense of self-defense.
Jerome McDowell testified he had known Stroud for twenty years. McDowell had two felony convictions — drug trafficking and CCW. He testified that prior to the shooting, Smith and Stroud had words and Smith (who was 6'4" and weighed 300 lbs.) stood up and faced Stroud and grabbed his right pants pocket. Stroud returned to his car, retrieved a weapon, and when he turned around, Smith was pointing a gun at him and fired first. McDowell testified that Stroud's car was parked at the curb, that Smith fired with his right hand, and that he, i.e., McDowell, didn't contact law enforcement to explain what happened.
Frederick Rogers testified that he had known Stroud for 15-18 years and had convictions for bank robbery and burglary. He testified that he was at 3117 Haberer, the home of his girlfriend, McGlown, when Hampton sought his help with Stroud. He emerged from the home to see Smith remove a gun from a bib overalls "top vest pocket" and fire twice at Stroud as he walked to his car. Stroud's car was in the middle of the street, and that when Stroud returned fire, he shot four to five times. Rogers stated that he had told Det. Dunsky that Smith had fired with his left hand.
The results of the atomic absorbtion test supported the conclusions that Smith discharged a weapon, handled a contaminated weapon, or was in close proximity to a weapon during discharge. Cross-examination of the testifying chemist revealed that the chemist who conducted the test did not subscribe to any particular conclusion other than that Smith's hands bore traces of antimony, barium, and lead, and that these elements would also be present on the hands of someone working under a car hood or changing a transmission. The test also revealed a higher level of these elements were on Smith's left hand.
It is fundamental that credibility of witnesses is the province of the finder of fact: here, the jury. The State's evidence, if believed, established that Stroud committed the crime of murder as defined by R.C.2903.02(B). In this case, the evidence does not weigh heavily against conviction — Thompkins, supra — particularly given the quality of the defense testimony, about which more will be said in our discussion of the second and third assignments of error. We decline to disturb the jury's verdict in this case, and the first assignment is overruled.
 2. DEFENDANT-APPELLANT WAS UNFAIRLY PREJUDICED AND DENIED HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE PROSECUTION MADE STATEMENTS IN ITS CLOSING ARGUMENT THAT WOULD CONSTITUTE PROSECUTORIAL MISCONDUCT.
 3. DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS DEFENSE COUNSEL FAILED TO OBJECT TO NUMEROUS COMMENTS MADE BY THE PROSECUTOR THAT AMOUNTED TO PROSECUTORIAL MISCONDUCT.
We will consider these assignments together. Because the prosecutor's remarks at issue under the second assignment were not objected to, we review them under the plain error standard: would the outcome clearly have been different without the prosecutor's remarks? State v. Carpenter (1996), 116 Ohio App.3d 615. This inquiry is similar to that for prejudice under a claim of ineffective assistance of counsel. State v. Bradley (1989), 42 Ohio St.3d 136, second prong: assuming counsel should have objected but did not, is there a reasonable possibility that, but for the failure to object, the result of the trial would have been different?
Stroud claims it was improper for the prosecutor to refer to McDowell and Rogers as "thugs." Each witness had two felony convictions and while this was a harsh characterization, it was within the latitude accorded the prosecutor in closing argument. State v. Liberatore (1982),69 Ohio St.2d 583.
Stroud next assails the prosecutor's characterizing McDowell and Rogers as liars and the claim of self-defense as a lie. It is not prosecutorial misconduct to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization. See State v. Gunn (Aug. 7, 1998), Montgomery App. No. 16617, unreported.
Although the prosecutor called McDowell and Rogers liars and the claim of self-defense a lie, the prosecutor did not state an unsupported personal opinion that the witnesses were liars — Compare Carpenter, supra, at 624 — and the evidence certainly supported an inference that the witnesses were untruthful.
First of all, as discussed above, the testimony of the State's witnesses conflicted with that of McDowell and Rogers, so that one version of what happened was truthful and the other was not.
Second, no gun attributable to Smith was found at the scene. Although Rogers "assume(d)" that Karen White had removed the gun from Smith, he admitted he didn't see her do so, and Douds, McGowen, and White all testified that none of them had done so (because Smith had no gun.)
Third, Rogers' and McDowell's stories were internally inconsistent in important respects. McDowell testified that Smith took a gun from his right pants pocket whereas Rogers testified the gun came from a bib overalls top vest pocket. McDowell testified that Stroud's car was parked at the curb whereas Rogers said it was in the middle of the street. McDowell testified that Smith held his gun in his right hand but Rogers said Smith used his left hand. McDowell testified that Smith fired first after Stroud had retrieved a weapon and turned to face Smith; Rogers testified that Smith had shot at Stroud as he walked to his car.
Finally, both McDowell and Rogers were soundly impeached. After testifying — seemingly improbably — that he didn't know the difference between a revolver and an automatic weapon, McDowell was interrogated on a prior written statement to the police that belied that claim of ignorance. Sgt. Gary White testified in rebuttal that he contacted Rogers on July 30 and that Rogers gave him a false name. At that same time, Rogers told White that he didn't see the shooting because he was inside 3117 Haberer but that he'd heard several shots. White said Rogers did not tell him Smith had a firearm or that he had seen Smith fire a gun or that Karen Smith had taken Smith's gun from the scene. White also testified that Rogers told him he didn't know who had shot Smith. Det. Gary Dunsky testified that he interviewed Rogers on September 30, 1999 and that Rogers told him Smith didn't shoot at Stroud until after Stroud had retrieved a gun from his car and turned to face Smith, and that Smith had fired in self defense.
Although not identified in Stroud's appellate brief, we do think that one remark of the prosecutor crossed the line of permissible advocacy:
 And I told you, I believe in jury selection, don't be surprised if somebody comes into this courtroom, walked up to this witness stand, raised their right hand to tell the truth, and then sat in this chair (indicating), and lied to us.
And you know what? I was right.
 I have been doing this for too long. I knew they would do that. And that's what they did.
Expressions of personal opinion about witness credibility are improper because they invade the province of the jury. Carpenter, supra at 622. Here, the prosecutor suggested he knew McDowell and Rogers were lying, based on his experience. However, this remark does not rise to the level of plain error nor does defense counsel's failure to object satisfy the second prong of the test for ineffective assistance of counsel. As noted above, ample evidence supported the prosecutor's remarks that McDowell and Rogers were indeed untruthful witnesses. 8 Stroud also claims the prosecutor vouched for one of the State's witnesses. The claimed impermissible statement was:
 You know, you could hear a pin drop in this courtroom when Angela Douds took that stand. And you know why? Because she was truthful with you.
Doud's testimony was very emotional. She testified that when Stroud started shooting, she called to Smith to follow her to her residence, saw Smith fall, called 911, returned to Smith as he lay dying — urging him to hang on, and held his hand as he died. The prosecutor's remark was not improper because it can be fairly read as an argument that Doud was truthful because she became so emotional during her testimony. Notably, Doud was but one of four State's eyewitnesses and the prosecutor did not make similar remarks about his other eyewitnesses.
Finally, Stroud complains of the prosecutor's repeated use of the words "smoke screen" or words of similar import to characterize defense testimony and his defense of self-defense.
We have never held that the use of the expression "smoke screen" or similar expressions during final argument is per se prejudicial.
We have, however, cautioned against too loose a use of "smoke screen" or similar expressions because they tend to insinuate "that defense counsel is suborning perjury by manufacturing, conceiving, and fashioning lies." State v. Hooper (June 1, 2001), Mont. App. No. 18375, unreported. (Emphasis ours.)
In this case, the prosecutor's use — indeed overuse — of "smoke screen" and words of similar import did not impugn the integrity of defense counsel. Rather, the term was used to refute the defense testimony and the defense of self defense. Compare State v. Keenan (1993), 66 Ohio St.3d 402.
The prosecutor used the term in connection with the atomic absorbtion test results. Although the test results were consistent with the defense story that Smith fired a gun, the chemists's testimony on cross examination that Smith's activities during the day and evening of working an asphalt job and changing a transmission would have left the same trace elements on his hands as if he had fired a gun undercut the probative valve of the test to the defense. While the prosecutor might have used different terminology to make his point, his failure to do so was not misconduct.
The prosecutor also used the term smoke screen in response to the defense statement during closing argument that there was some inconsistency in the State's testimony as to how far Smith moved after Stroud started shooting before he was dropped by a bullet. The prosecutor appears to have used the "smoke screen" rhetoric to suggest the irrelevance of this inconsistency to the central issues in the case: was Smith armed? If so, did he fire first? This was not improper.
The prosecutor also used the terms "smoke screen" and "red herring", along with the word "lie" to characterize Rogers' testimony that he saw Smith with a gun. Despite the verbal overkill, these remarks did nothing more than highlight the prosecutor's argument that Rogers' testimony was untruthful. For reasons stated above, the testimony supported that argument.
Finally, the prosecutor utilized "smoke screen" and similar terminology to disparage the defense of self defense. The prosecutor went through the elements of self defense and told the jury why Stroud hadn't satisfied any of them. While doing so, he utilized the smoke screen terminology to emphasize his argument. While the prosecutor might have been more circumspect, we see no prosecutorial misconduct in these remarks.
Having found no prosecutorial conduct that rises to the level of plain error, we overrule the second assignment of error. Having found no ineffectiveness of counsel in failing to object that suggests a reasonable possibility of a different result had counsel objected, we overrule the third assignment of error.
The State had a strong case of murder and Stroud had a weak case of self defense. We are well satisfied that Stroud had a fair trial.
The judgment will be affirmed.
BROGAN, J., and FAIN, J., concur.