{¶ 41} I respectfully dissent from the majority's opinion and conclusion in this matter.
 {¶ 42} At the outset of the majority opinion, it indicates that the victim involved here "disclosed rather sketchy details involving certain incidents and could not recall virtually any of the details of others" and then proceeds to state that the victim provided loose time frames for each incident where alleged sexual encounters transpired, the manner of their occurrence, and appellant's conduct during such sexual acts.
 {¶ 43} This writer has closely scrutinized the entire transcript in this case. I would indicate from such examination that the victim's testimony regarding the ten incidents, which are the subject of the charges involved in this case, were recanted by her with respect to the expressed sexual acts in more than sufficient detail as to what occurred in each of those events, and she graphically discussed the manner in which appellant engaged in sexual acts with her.
 {¶ 44} For example, she testified that the first sexual encounter with appellant occurred in their home during the winter of 2000-2001. She indicated that she was getting ready for school and was watching the weather channel at about 6:30 a.m., and further stated that her mother was at work and her brother was also not at the home at that time. She related that she was on the couch watching the weather channel when appellant began to touch her and started to have intercourse as is evident from the following portion of the transcript:
 {¶ 45} "Q. You said you had intercourse. Do you remember how your clothes came off?
 {¶ 46} "A. He took them off.
 {¶ 47} "Q. Did you have pants or a skirt?
 {¶ 48} "A. I had pants, I think.
 {¶ 49} "Q. And at that point where were you located in the house?
 {¶ 50} "A. In the living room.
 {¶ 51} "Q. And nobody else home?
 {¶ 52} "A. No.
 {¶ 53} "Q. Was your mom working one of her seven to seven shifts?
 {¶ 54} "A. Yes.
 {¶ 55} "* * *
 {¶ 56} "Q. Describe what he did.
 {¶ 57} "A. He would just touch my breasts.
 {¶ 58} "Q. Were your clothes on or off?
 {¶ 59} "A. They were on.
 {¶ 60} "Q. Did he [at] any point attempt to kiss you or anything?
 {¶ 61} "A. No.
 {¶ 62} "Q. What did he do? Describe the actual intercourse event for the jury.
 {¶ 63} "A. He would take off my clothes and he would take down his pants and then he would just have intercourse.
 {¶ 64} "Q. Describe for us that day how — did his penis penetrate your vagina?
 {¶ 65} "A. Yes.
 {¶ 66} "Q. And I don't mean this like an insensitive question, did it hurt?
 {¶ 67} "A. It hurt.
 {¶ 68} "Q. Like what? Describe it.
 {¶ 69} "A. Pain.
 {¶ 70} "Q. How long did the two of you have intercourse?
 {¶ 71} "A. It wasn't very long because my bus was coming.
 {¶ 72} "* * *
 {¶ 73} "Q. What position were you laying at that time? Can you describe the position of yourself and your father?
 {¶ 74} "A. I was laying on the couch, my head towards the armrest and he was on top of me."
 {¶ 75} According to the victim's further testimony, another sexual encounter occurred on July 4, which according to the record was 2003, at their home in her brother's bedroom while she was watching television while no one else was at home. She stated that appellant came in and starting taking off her clothes and that while she was lying on the floor they engaged in intercourse at that time. She further testified with regard to that occasion:
 {¶ 76} "A. I was on the bottom, he was on the top. My head was facing towards my brother's window.
 {¶ 77} "Q. Towards your brother's window?
 {¶ 78} "A. Yes.
 {¶ 79} "Q. Do you remember [if] either of you had clothing on?
 {¶ 80} "A. I didn't and I don't think he did.
 {¶ 81} "Q. But you're not positive?
 {¶ 82} "A. I'm not positive.
 {¶ 83} "Q. What do you remember about the actual act of intercourse itself in regards to did his penis penetrate your vagina?
 {¶ 84} "A. Yes.
 {¶ 85} "Q. What did that feel like? I hate to ask that but I have to. Did it hurt?
 {¶ 86} "A. It didn't really hurt. There was times before he had done it, I had just gotten used to it.
 {¶ 87} "Q. Didn't hurt that time?
 {¶ 88} "A. No.
 {¶ 89} "Q. Do you know if your father ejaculated that day?
 {¶ 90} "A. Yeah.
 {¶ 91} "Q. What do you recall about that?
 {¶ 92} "A. After he was done I got up and I went into the bathroom and when I went to the bathroom there was white stuff in the toilet.
 {¶ 93} "Q. And there was white stuff in the toilet, you say?
 {¶ 94} "A. Yeah."
 {¶ 95} According to the victim, the last sexual encounter with appellant took place on September 29, 2003, again at their home with no one else present. She described this last encounter in part in this manner:
 {¶ 96} "A. He took down my pants in the kitchen, he had his pants down. He like kind of dragged me to the living room and then we laid on the floor and had intercourse.
 {¶ 97} "Q. Do you remember what position your body was in?
 {¶ 98} "A. I was on the bottom, my head facing towards my parents' room and he was on top.
 {¶ 99} "Q. And did his penis penetrate your vagina?
 {¶ 100} "A. Yes."
 {¶ 101} The other sexual encounters between appellant and the victim were described in the same express and specific manner. Thus, this writer cannot agree that the description of the sexual acts in question were "sketchy" or recalled in some equivocal manner.
 {¶ 102} Thus, the majority's characterization that the occasions of the sexual acts were related by the victim without sufficient details is again not supported by the record. Her versions of the incidents occurring outside their home are equally definitive as to the sexual conduct that occurred. Regarding all the incidents occurring at their home, the testimony of the victim was most specific as to the home being the situs of those particular occurrences. She also was graphic about the exact rooms or location in the home where these events transpired as was previously shown in portions of her testimony. Additionally, with respect to the sexual assaults that occurred while she accompanied her father on his Akron Beacon Journal delivery route, her testimony is more than adequately detailed as to those locations. Her account in her testimony of those sites was clearly corroborated by Ron Craig, the prosecutor's investigator, who accompanied her when she traveled with him through appellant's route as evidenced not only by their respective testimony, but also by the photographic exhibits of those places found in State's Exhibits One through Six which were admitted into evidence.
 {¶ 103} While the majority's discussion of the time frames for each incident is generally accurate, it bears some qualification when it refers to time frames being loose for each incident. Clearly, the reference to the September 29, 2003 incident was most specific. With respect to the remaining charges and their time frames, which were referenced in the victim's testimony, they manifested a reasonably adequate set of calendar time. Appellant's counsel did not raise an issue through a bill of particulars in this regard, and there was no indication made by appellant that sufficient notice of the time frames of the remaining charges provided an inadequate notice to appellant in a due process context in order to impede his ability to provide an adequate defense to the charges involved here.
 {¶ 104} This court has applied the following three pronged analysis when determining whether a defendant has been prejudiced by the lack of a specific date of the offense:
 {¶ 105} "`First, it must be determined whether time was an element of the alleged offense. Second, it must be determined whether the state disclosed to the defendant all of the information it had concerning when the offense occurred. Third, even if full disclosure has taken place, it must be decided whether the state's inability to pinpoint the time has prejudiced the defendant's ability to fully defend himself.'" (Citation omitted.) State v. Latorres (Aug. 10, 2001), 11th Dist. Nos. 2000-A-0060 and 2000-A-0062, 2001 Ohio App. LEXIS 3533, at 10, citing State v. Lawrinson (1990), 49 Ohio St.3d 238, 239.
 {¶ 106} In cases involving alleged sexual misconduct with children, this court and other courts have held that it is not mandatory for the state to provide precise dates and times.Latorres at 10, citing Lawrinson at 239. This proposition is supported by the fact that the specific date of sexual contact or sexual conduct is not an element of either gross-sexual imposition or rape. R.C. 2907.02(A); R.C. 2907.05(A). See, also,State v. Stalnaker, 11th Dist. No. 2004-L-100, 2005-Ohio-7042, at ¶ 92.
 {¶ 107} Moreover, as discussed previously, appellant has failed to establish he was prejudiced by the absence of a specific date for each offense. Again, at no time did he request a bill of particulars which would provide specific dates. Also, the exact dates of the offenses were not necessary for appellant to fully defend himself, as his defense did not attempt to establish that he was not with the victim when the offenses occurred. See, e.g., Latorres at 11-12.
 {¶ 108} Under appellant's first assignment of error, which avers that the prosecution engaged in a pervasive pattern of misconduct, the majority discusses three issues in its analysis to support its conclusion that appellant was denied a fair trial.
 {¶ 109} The first issue addressed by the majority deals with appellant's request prior to the opening statements in the nature of a motion in limine to limit the state's case to those charges contained within the indictment and not to permit evidence or mention of any other sexual conduct that may have transpired in the general time frames involved in the charges against appellant. The trial court granted this motion with the admonition to the state that it would enforce that ruling unless the state would provide a foundation or basis for an exception under Evid.R. 404(B).
 {¶ 110} During the opening statement, the prosecutor made the following remark:
 {¶ 111} "She will testify to you she was asked to recall best she could these crimes that occurred to her, and that she will testify she did the best job she could in picking out the approximate dates and times."
 {¶ 112} Appellant's counsel requested a sidebar, which was granted, and interposed an objection to that language which he argued suggested that there were other sexual encounters. The prosecutor indicated he wasn't talking about any other charges or sexual events. The trial court overruled the objection.
 {¶ 113} The majority concludes by indicating that this portion of the first assignment of error was not well-taken. This writer agrees with that conclusion. However, the majority then posits that that incident foreshadowed problems posed during the trial with respect to the relentless "piling on" of questionable trial tactics by the prosecution. Again, I concur with the observation that no error obtained with respect to the trial court's ruling on that issue. However, I do not agree with the implication that a cancerous progression obtained as suggested by the majority. A close examination of the foregoing quote and the diction which it employed does not, in this writer's judgment, provide any basis for references to other acts beyond those charged in the indictment here. Consequently, I do not agree that the statement provided any nexus of a non-benign connection as to what transpired in the ensuing proceedings.
 {¶ 114} The majority then engages in a discussion of the second issue dealing with the prosecutor's persistent use of leading questions which, in its judgment, resulted in prosecutorial misconduct and a basis of error under the first assignment of error. This writer deems this particular portion of the first assignment of error to be the primary issue on appeal.
 {¶ 115} I agree with the majority that the prosecutor's line of questioning with the victim and some of the other state's witnesses was excessive and unnecessary. I would further state that this respective approach in the direct examination of the state's witnesses should not euphemistically or otherwise be characterized as a pedagogical model for law students and practitioners regarding a forum of non-leading questions. Certainly, there appears to be a significant lack of interrogatories prefaced by "what," "where," "when," and "how," and the alternative forms of "state whether or not," or "did you or did you not."
 {¶ 116} Indeed, the format utilized by the prosecutors goes beyond preliminary matters. However, the primary question to be resolved here is whether there was legal prejudice or clear injustice to appellant. United States v. Durham (C.A.4, 1963)319 F.2d 590; State v. Smith, 97 Ohio St.3d 367,2002-Ohio-6659, at ¶ 48. See, also, State v. Huckabee (Mar. 9, 2001), 11th Dist. No. 99-G-2252, 2001 Ohio App. LEXIS 1122, at 21.
 {¶ 117} Like the majority, I too, have carefully scrutinized all of the testimony in the record of this case involving the eleven witnesses who were called in the state's case. After that examination, it is my considered view that almost all of the leading questions were transitional in character, and some referred to prior testimony which did not result in prejudice to appellant.
 {¶ 118} Because of appellant's challenge in this regard, and also as a result of the majority's position on this issue, I feel it is appropriate to set forth those particular questions which go to the heart or substance of the matters in this case and to which the defense did submit timely objections.
 {¶ 119} This reader's thorough examination of the transcript reveals only five such instances in which the prosecution asked the victim a leading question that related to arguably material testimony. The leading questions pertained to the victim's conduct following her argument with appellant; a specific date appellant had intercourse with the victim; two statements made by the victim to a nurse during a medical examination; and a statement made by the victim to the investigator regarding a location on appellant's paper route. With respect to the foregoing five questions, the first one did not relate to any alleged sexual encounters. The fifth question was submitted to the victim after the investigator had testified as to that particular location prior to the victim being called to testify.
 {¶ 120} Considering, particularly, the length of the victim's testimony, this writer fails to perceive prejudice or injustice to appellant and his right to a fair trial based on the paucity of critical and substantive leading questions posed by the state to her or the other witnesses.
 {¶ 121} With regard to the majority's comments that the prosecution cannot employ tactics requiring a defense counsel to become a jack-in-the-box popping up every third minute to object, I would observe that appellant's counsel made no effort to invite a sidebar comment to the trial court out of the hearing of the jury, to request a line of continuing objection to such questions, and to invite the trial court to admonish the prosecutor to the effect that any repetition of that form of questioning could well result in some type of sanction. Through such methodology, skilled counsel can appropriately avoid a "Charlie Chaplin exercise."
 {¶ 122} Additionally, the majority states that when appellant's counsel moved for mistrial at sidebar, the trial court felt compelled to note in front of the jury that it had sustained appellant's objections to leading questions. I would observe that the record does not necessarily support the inference that this was done within the hearing of the jury. Also, the majority suggests that the tenor of that trial court's statement, coupled with the prosecutor's vouching to that remark, was violative of State v. Keenan (1993), 66 Ohio St.3d 402. However, this writer notes that the majority's citation toKeenan with respect to leading questions is misplaced since that case dealt with prosecutorial misconduct with regard to personal opinions, denigration of defense counsel, appeal to emotion, and bad character.
 {¶ 123} Nor does this writer, who authored the opinion inState v. DeMarco (1987), 31 Ohio St.3d 191, conclude that the foregoing colloquy coupled with the issue of leading questions rise to the crest of cumulative error with regard to the issue of leading questions in this case.
 {¶ 124} The third issue addressed by the majority under the first assignment of error references prosecutorial misconduct in what I would characterize as the closing argument. As the majority indicates, appellant argues that the prosecutor engaged in misconduct there by expressing his own personal beliefs regarding the truthfulness of the victim's testimony and by mentioning facts not in evidence. The record reflects that the prosecutor, on two brief occasions, did argue that the victim's testimony was the truth and that her demeanor showed that she was being honest and truthful. The prosecutor also stated that the victim's brother was sent away again to the bank by her father, to get the $60, and the $60 was presented to her, in her own testimony, conditioned upon sex with her father. This comment by the prosecutor was obviously in reference to his earlier utterance in opening statements that this money was for a homecoming dress for the victim for sex with appellant. I agree with the majority that no objection was interposed by appellant's counsel to those comments and that the matter, thus, must be reviewed on a plain error basis.
 {¶ 125} It is conceded that the prosecutor did not have an evidential basis for the money for the homecoming dress statement being conditioned on sex with her father. However, at another point of the record, the victim did indicate that she did receive favorable treatment with regard to interacting with her friends when appellant performed sexual acts with her.
 {¶ 126} It is fundamental when reviewing allegations of prosecutorial misconduct in final arguments that the argument should be reviewed in its totality. State v. Moritz (1980),63 Ohio St.2d 150, 157 (holding that a prosecutor's closing argument must be viewed in its totality to determine whether the remarks were prejudicial). While the foregoing comments by the prosecutor were not proper, however, when viewed in the context of the totality of his argument, I cannot agree with the majority that this again rises to the crest of plain error under the circumstances. Thus, I would conclude that there was no reversible error with respect to the three issues raised by appellant under the first assignment of error.
 {¶ 127} The majority then addresses appellant's second assignment of error in which he claims the trial court erred in not granting his motion for a mistrial. The majority finds that assignment of error is also well-taken on the basis of its analysis under the first assignment of error regarding the misuse of leading questions plus supplying answers to its witnesses as a result of such questions. Thus, the majority concludes that the error committed through the use of such leading questions, when joined with other prosecutorial misconduct in final argument on a plain error basis, and its cumulative effect, also results in the second assignment of error also being well-taken.
 {¶ 128} Based on this writer's analysis of issues under the first assignment of error, I would also conclude that the trial court did not commit error in its denial of appellant's motion for a mistrial. Consequently, I would affirm the trial court.