Thomas Michael KEENAN, Petitioner,

v.

Margaret BAGLEY, Warden, Respondent.

No. 1:01CV2139.

United States District Court, N.D. Ohio, Western Division.

May 7, 2003.

Jeffrey M. Gamso, Law Offices of Jeffrey M. Gamco, Jeffrey J. Helmick, Helmick, Prajsner & Hoolaha, Toledo, CA, Paul A. Mancino, Jr., Cleveland, OH, for Respondent.

Henry G. Appel, Tara L. Berrien, Office of the Attorney General, State of Ohio,

## MEMORANDUM OPINION AND ORDER

KATZ, District Judge.

### I. Introduction

This matter is before the Court upon Petitioner, Thomas Michael Keenan's Motion to Alter or Amend the Court's decision to dismiss his petition for failure to comply with the statute of limitations, (doc. no. 71), and Motion to Expand the Record,

(doc. no. 72). Respondent opposes the Motion to Alter and Amend Judgment, but does not oppose the Motion to Expand the Record (doc. nos. 74, 75).

Respondent, Margaret Bagley, moved to dismiss the Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, (doc. no. 20). Respondent alleged that Keenan is barred from federal habeas corpus review because he untimely filed his Petition. Specifically, Respondent alleged that Keenan's state post-conviction petition was not "properly filed," pursuant to 28 U.S.C. § 2244(d)(2), preventing that state-court proceeding from tolling the one-year statute of limitations. Upon reviewing all briefs, the Court granted Respondent's Motion and dismissed the case, (doc. no. 69).

Thereafter, the Petitioner filed the instant Motion to Alter and Amend Judgment, pursuant to Federal Rule of Civil Procedure 59(e), seeking relief from the Court's decision to dismiss the Petition. Keenan alleges that the Court erred in failing to certify to the Ohio Supreme Court the question of whether Ohio Revised Code §§ 2953.21(a)(2) and 2953.23(a), which govern the filing of Ohio successive or successor post-conviction petitions, are jurisdictional requirements or statutes of limitation that the state must either raise or waive. Keenan also contends that the Court misapplied the *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), actual innocence standard when it found that Keenan did not demonstrate actual innocence sufficient to equitably toll the statute of limitations. Additionally, Keenan has filed a Motion to Expand the Record to include the transcripts of co-defendant Joe D'Ambrosio's trial, transcripts of co-defendant Edward Espinoza's guilty plea, and affidavits from two Cleveland Police Detectives Ernest Hayes and Melvin Goldstein. The Court addresses both Motions below.

## II. Standard of Review

Federal Rule of Civil Procedure 59(e) permits a party to file a motion to alter or amend a judgment. Fed.R.Civ.P. 59(e). The Sixth Circuit has determined, however, that a court should grant such a motion only "if there is a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice." *GenCorp, Inc. v. Am. Int'l Underwriters Co.*, 178 F.3d 804, 834 (6th Cir.1999) (citations omitted). Consequently, a party cannot utilize a Rule 59(e) motion to re-litigate issues the Court previously considered. *Keweenaw Bay Indian Cmty. v. United States*, 940 F.Supp. 1139, 1141 (W.D.Mich.1996). Additionally, a party wishing to alter or amend a judgment may not "raise arguments which could, and should, have been made before judgment issued." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.1998). Rather than filing a Rule 59(e) motion, the proper action for a party seeking redress on issues previously litigated is to appeal. *Keweenaw Bay Indian Cmty.*, 940 F.Supp. at 1141; *Dana Corp. v. United States*, 764 F.Supp. 482, 489 (N.D.Ohio 1991).

## III. Certification Issue

Keenan first asserts that the Court erred when it decided not to certify the following questions to the Ohio Supreme Court:

1. Are the time limits of Ohio Revised Code §§ 2953.21(A)(2) and 2953.23(A) jurisdictional or are they statutes of limitation that work as affirmative defenses that must be pleaded or waived?

2. Is a petition for post-conviction relief timely filed pursuant to a *Glenn* order, *State v. Glenn*, 33 Ohio St.3d 601, 514 N.E.2d 869 (1987), in fact timely filed?

3. Does the Supreme Court of Ohio have the authority to permit filing a post-conviction petition in Ohio courts when the petition would otherwise be untimely?

Doc. no. 71, at 4–5. Thus, Keenan objects to the Court's decision to deny his *Glenn* and jurisdictional issues without the Ohio Supreme Court's interpretation of Ohio law. For the reasons stated below, the Court will not alter or amend its prior judgment on either issue.

### A. *Glenn* Issue

Keenan first alleges that the Court erred by not certifying the *Glenn* issue to the Ohio Supreme Court.[1] Even if the Court were to certify this question to the Ohio Supreme Court, that court's favorable decision would afford Keenan no relief. As the Court stated in its Order of Dismissal:

[T]he timing of the Ohio Supreme Court's order undercuts Keenan's [*Glenn*] argument. The Ohio Supreme Court received Keenan's court records on November 6, 1996. (Doc. 20, Ext.B.) Thus, according to § 2953.21, the petition was due 180 days after this date, or May 5, 1997. The Ohio Supreme Court did not issue its stay of execution order until December 7, **1998,** almost a year and a half after Keenan should have filed the petition under the statute. Thus, the Ohio Supreme Court's order is irrelevant to Keenan's required filing date.

Order of Dismissal, at 8–9. While the Court alternatively relied on the Ohio Court of Appeals' holding that the *Glenn* order does not alter the § 2953.21 statutory filing deadline, the fact remains that were the Ohio Supreme Court to hold to the contrary, Keenan could not benefit

---

**1.** While the Court did not specifically address the certification question in its Order of Dismissal, its finding that the issue was without merit obviated the need for certification.

from this holding because his *Glenn* order was issued almost a year and a half after the statutory filing deadline had passed. Thus, Keenan cannot prevail on this issue even if the Court were to now grant his certification request. To the extent that Keenan is arguing that the *Glenn* order provides him with a new statute of limitation rather than merely extending the § 2953.21 statute of limitation, the Court finds this argument unpersuasive as it lacks any supportive authority.

Moreover, Keenan has not demonstrated, as he must under Rule 59(e), that the Court committed a "clear error of law" by relying on the Ohio Court of Appeals' decision. Without demonstrating that a clear error of law or fact occurred, the Court may not alter or amend its prior decisions. *GenCorp, Inc.*, 178 F.3d at 834. Accordingly the Court denies Keenan's motion to certify the *Glenn*-related question to the Ohio Supreme Court.

### B. Jurisdiction/Waiver Issue

The Court finds Keenan's assertion that it erred in deciding the jurisdiction/waiver issue to be equally unpersuasive. Keenan asserts that the Court erred when it followed the Ohio Court of Appeals' holding that § 2953.21 is a jurisdictional requirement to filing a successive petition, rather than a statute of limitation that the state can waive. Instead, Keenan argues, this Court should accept nothing less than an Ohio Supreme Court decision as that court is the final arbiter of how to interpret Ohio law.

■ While the Court agrees that an Ohio Supreme Court decision on this issue would settle the question, the Court finds its prior decision not to certify these ques-

tions to the Ohio Supreme Court is proper. As the Court stated in its Order of Dismissal, it is bound by the Sixth Circuit's holding in *Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir.2001), that "federal courts must accept a state court's interpretation of its statutes and its rules of practice." *Id.* at 771 (citation omitted).

■ While Keenan now argues that only the Ohio Supreme Court is authoritative, the *Israfil* holding teaches otherwise. In *Israfil*, the Sixth Circuit relied on the Ohio Court of Appeals' decision, which found the petitioner's third motion for post-conviction relief was not timely filed. *Id.* In fact, a review of *State v. Israfil*, No. 17472, 1999 WL 960971, at *3 (Ohio App. July 16, 1999), reveals that the Court of Appeals in that case faced circumstances quite similar to what the Court of Appeals faced in Keenan's case. In *State v. Israfil*, the post-conviction court had barred the petitioner's claims on grounds of *res judicata*. The Court of Appeals found that because Israfil did not timely file his post-conviction petition and did not meet any § 2953.23(A) exception to the time for filing requirement, "the trial court had no jurisdiction to entertain Israfil's untimely filed petition." *Id.*

Contrary to Keenan's assertions, the Sixth Circuit did not deem it necessary to procure an Ohio Supreme Court opinion on the jurisdictional nature of § 2953.21 before deferring to the Ohio Court of Appeals' interpretation of the statute. Thus, as is demonstrated by the *Israfil* holding, this Court's decision to defer to the Court of Appeals' decision in Keenan's case was not a manifest error of law. The Court will not alter or amend its decision on this issue.[2]

---

**2.** The Court notes, moreover, that espousing Keenan's position that a habeas court may only look to Ohio Supreme Court law to resolve post-conviction issues could have unintended consequences. As Keenan remarks in

footnote one of the Motion, "the Supreme Court of Ohio has consistently failed to examine the substance of the post-conviction law." Doc. 71, at 6 n. 1. Thus, because the Ohio Supreme Court decides very little case law on

## IV. Actual Innocence Issue

### A. Standard of Review

■ In his Motion to Alter and Amend Judgment, Keenan maintains that, while the Court identified the correct standard for excusing a procedural default because of actual innocence, the Court misstated the proper means by which to apply that standard. In its Order of Dismissal, the Court identified *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) as the authority on how a federal habeas court should analyze actual innocence claims. That standard bears repeating here:

It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

Order of Dismissal, at 12 (quoting *Schlup* at 329, 115 S.Ct. 851).

■ The Court further stated in its Order of Dismissal that, "as *Schlup* dictates, the Court cannot consider any evidence presented during Keenan's trial when reviewing his actual innocence claim." Order at 13. As Keenan correctly notes, this assertion is erroneous. The Court must, according to *Schlup*, consider all evidence when subjecting an actual innocence claim to the *Schlup* standard. As the *Schlup* Court indicates, however, it is only with new evidence that a habeas court may

seriously consider the petitioner's actual innocence claim. The *Schlup* Court stated, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Id.* at 865. Thus, once a district court determines that the evidence the petitioner proffers during the habeas proceeding is indeed new reliable evidence, the district court then considers the new evidence, along with evidence adduced during trial, in conducting its reasonable juror analysis.

The new evidence raised in *Schlup* and the Supreme Court's analysis in finding that Schlup had met the actual innocence standard is instructive here. In *Schlup*, the petitioner claimed that he had been the victim of mistaken identity in the murder of a prison inmate. Although a corrections officer testified during trial that he witnessed Schlup and two other inmates attack the victim, videotape revealed that, 65 seconds after the prison guards sounded a distress call, Schlup walked leisurely into the dining hall. *Id.* at 303, 115 S.Ct. 851. Thus, the timing of the distress call and whether Schlup had ample time to appear on the videotape after it became a hotly contested issue during trial.

During habeas proceedings, Schlup presented three new items of evidence that the Court found particularly noteworthy: First, the Court found significant a transcript from an interview with inmate John Green, a clerk for the housing unit who indicated that he called for help soon after the corrections officer initially on the scene had requested it. *Id.* at 857–58. Schlup also produced the affidavits of two inmate

its own accord, Ohio federal habeas courts seeking Ohio Supreme Court authority on post-conviction issues would continually have to certify questions to the Ohio Supreme

Court to settle issues of Ohio's post-conviction law once raised in a habeas proceeding. This practice would thwart the policy of judicial efficiency and economy.

eyewitnesses to the murder who indicated that Schlup was not a party to the murder.[3] Finally, Schlup obtained an affidavit from a corrections officer who indicated that, around the time of the murder, he witnessed Schlup walking at a leisurely pace toward the dining hall and that he was not "perspiring or breathing hard, and that he was not nervous." *Id.* at 312, 115 S.Ct. 851. Finding that the strength of the eyewitness and alibi testimony met the standard, the Court held that Schlup had asserted an actual innocence claim sufficient to excuse his procedural default.[4] By comparison, there is no such compelling evidence here.

### B. New Evidence

#### 1. Hayes and Goldstein Affidavits

Keenan alleges that the conclusions reached in the affidavits of Ernest Hayes and Melvin Goldstein constitute new evidence, entitling him to a *Schlup* review. Cleveland Police Department Detectives Hayes and Goldstein were the law enforcement officers who initially responded to a call that a body had been discovered in Doan Creek.[5] In affidavits that co-defendant Joe D'Ambrosio's habeas counsel procured in December 2001, Hayes and Goldstein concluded that, based on their observations of the scene at the time they first viewed Klann's body, Klann "was not murdered at Doan Creek but he was murdered elsewhere and his body was dumped

at Doan Creek." Doc. 71, at Exhibits A, at 2, B, at 2.

The detectives based their conclusions on several observations they made during their investigation. First, both noted that they observed no blood stains at the scene. They also stated that they saw no tire tracks or signs of a struggle on the creek bed in the area where Klann's body was found. These affidavits, Keenan concludes, unquestionably prove that Edward Espinoza perjured himself when he testified that Keenan and D'Ambrosio murdered Klann at Doan Creek. Thus, concludes Keenan, he is actually innocent of Klann's murder.

Respondent procured and filed a second set of affidavits from Hayes and Goldstein in her Opposition to the Motion. Doc. 74, at Exhibit A and B. In these affidavits, produced in February, 2002, the detectives averred that, while their initial impressions were that Klann was killed elsewhere, based on evidence presented at trial and the subsequent investigation of Cleveland Police Officer Leo Allen who followed up on Hayes and Goldstein's initial investigation, it is possible that Klann was killed at Doan Creek. Furthermore, Respondent argues that all of Hayes and Goldstein's observations can be explained by Espinoza's description of how the murder occurred. First, Espinoza's testimony did

---

**3.** The Court found these statements particularly credible because the affiants were African–American yet averred that Schlup, a white inmate, took no part in what was apparently a race-based killing. *Id.* at 316.

**4.** The Court distinguished Schlup's actual innocence claim, in which Schlup attempted to use actual innocence as a means to excuse his procedurally defaulted claims, also known as a "gateway" actual innocence claim, from a "free-standing" actual innocence claim discussed in *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). In *Herrera,* the petitioner asserted that, even though

his state-court proceedings were free from constitutional error, he was entitled to relief based on evidence of actual innocence. Because Keenan is asserting that his actual innocence should equitably toll the statute of limitations and entitle him to a review of the claims of constitutional error raised in the Petition, the Court finds that Keenan's assertions of actual innocence are "gateway" claims, and therefore must be analyzed under *Schlup.*

**5.** Once Hayes and Goldstein filed an initial report, however, they were no longer part of the Klann murder investigation.

not describe a struggle. Instead, Espinoza stated that Keenan "told Anthony to put his head back." Doc. 26, at 446. When Klann complied, Keenan cut his throat and pushed Klann in the creek. *Id.* Thereafter, Espinoza testified, Klann got up and ran and Keenan instructed D'Ambrosio to "finish it." D'Ambrosio complied, killing Klann while both were standing in the creek. *Id.* at 446–47. Thus, Respondent asserts, these facts would explain why no blood stains or signs of a struggle were apparent on the creek bed. Finally, Respondent asserts that no tire marks were present on the creek bed because Keenan drove his truck on an access road that ran parallel to the creek.

 Initially, the Court finds that the Hayes and Goldstein affidavits do constitute new evidence. While Hayes testified during Keenan's 1989 and 1994 trials, he gave no opinion as to where he thought Klann was killed. In fact, during the 1994 trial, Hayes was asked but refused to speculate how the murder occurred.[6] In so concluding, however, the Court finds that these affidavits fall decidedly short of the *Schlup* standard. Moreover, they do not, as Keenan alleges, provide absolute proof that Espinoza lied or that Keenan is actually innocent.

While Hayes and Goldstein's conclusions undercut Espinoza's version of events, they do so only marginally. Unlike in *Schlup* where new eyewitness and time line evidence made the petitioner's involvement in the crime a near factual impossibility, the detectives' affidavits merely describe their impressions based on their initial observations of the crime scene. As Respondent notes, many of the detectives' observations do not contradict Espinoza's testimony regarding how the murder oc-

curred. The lack of blood stains and signs of a struggle, as well as the lack of tire marks on the creek bed are largely compatible with Espinoza's trial testimony. Thus, while a hypothetical juror may have found that Hayes and Goldstein's conclusion that Klann's body was dumped at Doan Creek undermined the state's theory of how the murder occurred, the affidavits do not persuade the Court that *no* juror, acting reasonably, would have voted to convict Keenan beyond a reasonable doubt. In so finding, the Court will not alter or amend its judgment based on the Hayes and Goldstein affidavits.

**2. Alibi Witnesses**

Keenan next claims that a number of affidavits, including that of co-defendant Joe D'Ambrosio, supply him with an alibi for Friday evening September 23, 1988 into the following Saturday morning. Keenan also has obtained affidavits of individuals who claim to have seen Klann alive on the evening of Friday, September 23. Taken together, Keenan claims, these affidavits demonstrate that Klann was killed on Friday evening into Saturday morning, a time frame for which Keenan has an alibi.

The timing of the murder and the events that preceded it were openly disputed during trial. As the Ohio Supreme Court stated when it reversed Keenan's first conviction on appeal:

> Espinoza and Lewis testified that the night of Klann's kidnapping was "Tequila Night" at Coconut Joe's. They thought this was a Friday, but the bar's employees testified that Coconut Joe's always held "Tequila Night" on Thursdays, and this testimony was unshaken on cross-examination. Also, Espinoza

---

**6.** Q: Do you have any idea where this individual met his untimely death?
A: No, I do not.
Q: You don't know if it was there?

A: No, I don't know anything about that individual other than he was found in that ditch.
Doc. 35, at 1142–43.

testified that it was raining when Keenan picked up Klann in the truck, early in the morning. According to the NWS [National Weather Service] statement, it rained in the Cleveland area in the early hours of Friday morning, but not at all on Saturday. Although Espinoza, Carolyn Rosell, and three other witnesses testified that Keenan looked for Lewis on Friday night, Espinoza and Rosell conceded that it could have been Thursday night, while the others seemed to have trouble recalling dates in general. Thus, substantial evidence suggests Keenan's search for Lewis took place on Thursday night-Friday morning, September 22–23. Yet the coroner concluded that Klann probably died on Saturday morning, September 24, and in any case well after 8:15 a.m. on Friday, September 23. This tends to refute Espinoza's account of the murder, weakening the state's case.

*State v. Keenan,* 66 Ohio St.3d 402, 613 N.E.2d 203, 210 (1993). These contradictions also surfaced in Keenan's second, 1994 trial.

The affiants providing Keenan with an alibi for Friday evening, September 23, testified during Keenan's trial. Consequently, the Court finds that because their testimony, and other testimony cited by the Ohio Supreme Court in the above opinion, note these contradictions, the affidavits that Keenan supplies to support his actual innocence claim do not constitute "new" evidence. Thus, the Court need not subject these affidavits to the "reasonable juror" *Schlup* standard because the actual trial supplies the Court with the outcome of what a reasonable jury might do.

Of the evidence Keenan proffers that suggests Klann was alive on Friday, September 23, the Court finds that while the Keeling and Stark affidavits as well as the DeBlasis police statement do constitute new evidence not raised during trial, they are insufficient, pursuant to *Schlup,* to meet the reasonable juror standard. First, the Court notes that these affidavits were not averred to by the actual declarants, Aileen Keeling and Robin Stark, but by Keenan's state court counsel, Paul Mancino, Jr. Mancino avers that he had a conversation with Keeling in 1990 during which she stated that she saw Klann alive at closing time on Saturday morning, September 24. Mancino also avers that Stark told him in 1990 that she saw Klann alive on Thursday, September 22 but did not see Klann thereafter. Doc. 71, Exhibits, at 23–27. Keenan also argues that the statement that Linda DeBlasis provided to the police reveals that Klann was alive and well on Friday evening, September 23.

The Court finds the Keeling and Stark affidavits of limited credibility because neither declarant averred to the statements. Moreover, Mancino procured these statements in 1990 yet Keenan failed to produce either witness during the 1994 trial or explain their absence in the instant Motion. Even if the Court were to find these affidavits credible, they would not demonstrate Keenan's actual innocence. The Stark affidavit merely indicates that Stark saw Klann on Thursday evening and that Keenan, D'Ambrosio, and Espinoza were also there. Alternatively, the Keeling affidavit indicates that she saw Klann alive on Friday evening. Taken together, these affidavits would tend to support Keenan's version of his whereabouts during the time frame of the murder.

Because there was ample contradictory evidence of the time of murder presented at trial, however, the Court finds that the affidavits, if presented to a reasonable juror, would not prevent such a juror from finding Keenan guilty of Klann's murder. Rather than providing the Court with new insight beyond the facts adduced during

trial, the Keeling and Stark affidavits merely repeat testimony of numerous trial witnesses: Keenan, Espinoza, D'Ambrosio, and Klann were at an establishment called Coconut Joe's on Thursday night, September 22, 1988 and Keenan has an alibi for Friday, September 23. While these affidavits further support Keenan's claims of innocence, the jury at Keenan's trial chose to reject similar testimony. As stated above, the Ohio Supreme Court noted the time discrepancy and that several employees of Coconut Joe's testified that the events occurred on "Tequila Night," which always occurred on Thursday evening. Because the affidavits are merely cumulative of what was presented to and rejected by the jury, the Court necessarily finds that a reasonable juror may have voted to convict Keenan despite the Keeling and Stark affidavits.

 Finally, Keenan alleges that the statement of Linda DeBlasis supports his actual innocence claim. DeBlasis stated to police that on Thursday evening Klann entered a bar known as Cactus Jack's, where she was working as a bar maid, and witnessed an altercation among Keenan, D'Ambrosio, Espinoza, and Klann She further stated that she saw Klann alive on Friday evening when he borrowed money from her. Doc. no. 85, at Exhibit 3. Respondent counters this affidavit with a current affidavit from DeBlasis, now Linda Hudak. In that affidavit, Hudak avers that she did see an altercation between the co-defendants and Klann but that Klann returned later that same evening to borrow money from her. Doc. no. 88, at Exhibit C. Because Hudak no longer asserts that her police statement is accurate, the Court finds it does not tend to prove Keenan's actual innocence. Thus, Keenan cannot demonstrate his actual innocence based on Hudak's police statement.

### 3. The Knife

Keenan next claims that the knife Espinoza stated was the murder weapon could not actually be the weapon used to kill Klann because the blade length was shorter than the wound. During trial, the Coroner, Elizabeth Balraj, testified that the knife Espinoza identified as the murder weapon could have inflicted the wounds despite the fact that the blade length was shorter than the wound depth. She stated:

> Even if [the knife] goes up to the point where it is one and a half inches deep, because of the force with which the knife is thrust, and the give, the chest would compress when the knife is thrust with force, the give, and the lungs also, if they are not expanded, and they are contracted, all those can only be caused by a short blade, but when the chest expands then the wound, when we examine it in its expanded state in autopsy, would appear long.

Doc. no. 36, at 1569–70.

Keenan suggests that a book, "The Pathology of Homicide," constitutes new evidence to dispute Dr. Balraj's testimony. This book states that the "failure of a weapon to 'fit' can exclude it categorically as the wounding instrumentality. A kitchen knife seven-eighths inch wide at a point two inches from its tip could not have produced a stab wound five inches deep whose maximum skin dimension is one quarter inch." *Id.* at 33. Keenan also asserts that, on authority of "The Pathology of Homicide," a stab wound with two clean edges must have come from a double-edged knife.

 Respondent notes, however, that the book that Keenan claims supports his actual innocence claim does not, in fact, do so. While "The Pathology of Homicide" does state that "there is usually a relationship between depth and width of a stab

wound and length and width of the responsible instrument," it further states that, "there are many exceptions" to this presumption. Doc. 88, at 9. Additionally, while the book notes that a double-edged knife causes a specific type of wound, it does not state that all wounds with clean edges must have been made with double-edged knives. Thus, this "new evidence" proves to be neither new, because it was discussed thoroughly during trial, nor is it evidence that furthers Keenan's claim that the state-proffered murder weapon could not, in fact, be so. Accordingly, the Court will not alter or amend its judgment based on this claim.

### 4. The Longenecker Rape

The final item of new evidence that Keenan contends supports his actual innocence claim is information about a rape that occurred prior to Klann's murder. On June 22, 1988, Paul "Stoney" Lewis was indicted for the rape of Christopher Longenecker. On August 1, however, the state dismissed the charges against Lewis and on October 20, 1988, the grand jury returned a no bill for the Lewis case. Doc. no. 88, at 10. At the time the rape occurred, Longenecker and Klann lived in the same apartment building. In fact, after the rape occurred, Klann came to Lewis's apartment asking for a cigarette. Doc. no. 98, at Exhibit C (police report). Longenecker used this opportunity to escape Lewis's apartment.

Keenan claims that the state dropped the rape charges against Lewis in exchange for his testimony during Keenan's trial. Because Keenan alleges that Lewis was a star witness at his trial, the secret deal would severely undercut the reliability of his conviction. Additionally, Keenan contends that Lewis, not Keenan, had a motive to kill Klann because Longenecker

began to cry after leaving Lewis's apartment with Klann and may have told Klann what occurred.[7] Thus, Keenan claims, it was Lewis who had a motive to kill Klann.

The Court finds this evidence fails to establish Keenan's actual innocence under the *Schlup* standard. First, it is questionable whether this evidence is indeed "new" evidence because it appears that counsel at both trials knew of the Longenecker rape. In Keenan's second, 1994 trial, counsel raised the issue at the conclusion of Lewis's testimony:

> Defense Counsel: Do you happen to know if [sic] Christopher Longenecker; you don't know who he is?
>
> Lewis: The name, I might know him if I seen him, but the name don't sound familiar.
>
> The Court: Any further questions?
>
> Defense Counsel: Judge, no. We decided there are none. Thank you. Nothing further.

Doc. 37, at 1930. Thus, it is arguable whether the Longenecker rape case constitutes the "new" evidence that *Schlup* contemplates.

Even if the Court were to find that the Longenecker rape provides new evidence not presented (or known about) during Keenan's trial, the Court could not hold that it establishes Keenan's actual innocence. Contrary to Keenan's assertions, Lewis was not a star witness in the state's case. In fact, a review of his testimony reveals that Lewis established three facts: (1) Espinoza, D'Ambrosio, and Klann were in the restroom at Coconut Joe's bar prior to Klann's murder and that Espinoza appeared to be arguing with Klann; (2) Saturday morning, September 24, after spending the night away from his apartment, Lewis returned to find his door

---

7. While the police report stated that Longenecker refused to tell Klann what happened, there is some indication that Klann later learned of the rape. Doc. 88, at Exhibit A.

had been kicked open; and, (3) upon hearing that a body matching Klann's build had been found in Doan Creek, he went to the Cuyahoga County Coroner's Office and identified Klann. Lewis's testimony, therefore, neither identified Keenan as Klann's murderer nor placed him at the crime scene. Much of Lewis's testimony, in fact, merely corroborated other witnesses' statements regarding the events that took place at Coconut Joe's. Consequently, a reasonable juror who learned of the Longenecker rape could still find Keenan guilty of murdering Klann.

## V. Motion for Discovery

At the conclusion of Keenan's Reply to the Motion, he asserts that he requires further discovery to develop his actual innocence claims. A habeas petitioner is entitled to discovery if "the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." R. Governing Section 2254 Cases 6(a). The "good cause" standard set forth in Rule 6 restrains a habeas petitioner from unbridled entitlement to discovery. "At the very least, it is clear that there was no intention to extend to habeas corpus, as a matter of right, the broad discovery [afforded in] ordinary civil litigation." *Harris v. Nelson*, 394 U.S. 286, 295, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) (citation omitted); *see also Lynott v. Story*, 929 F.2d 228 (6th Cir.1991)(following *Harris*).

 To demonstrate "good cause," a habeas petitioner must state a specific allegation that, if fully developed, would entitle the petitioner to relief. *Bracy v. Gramley*, 520 U.S. 899, 908–09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). Although a petitioner is not required to demonstrate that discovery would unquestionably lead to a cognizable claim for relief, "vague and conclusory assertions are not sufficient under Rule 6 and a petitioner may not embark on a fishing expedition intended to

develop claims for which there is no factual basis." *Payne v. Bell*, No. 98–2963, 2000 WL 235752, at *1 (M.D.Tenn. Feb. 15, 2000)(citing *Calderon v. United States Dist. Ct. N. Dist. Cal.*, 98 F.3d 1102, 1106 (9th Cir.1996)).

 The Court finds discovery unnecessary in this case because Keenan has failed to demonstrate that further factual development would establish his actual innocence. In fact, the Court has granted Keenan's multiple requests to delay its ruling on the instant Motion because Keenan asserted that discovery in co-defendant Joe D'Ambrosio's habeas case would demonstrate his actual innocence. Notwithstanding these delays, Keenan has not supplied the Court with evidence of, or any indication that further discovery would lead to evidence of, Keenan's actual innocence. Thus, the Court denies Keenan's motion for discovery.

## VI. Motion to Expand the Record

Finally, Keenan has moved the Court to include in the record the trial transcript of co-defendant Joe D'Ambrosio, the guilty plea transcript of co-defendant Edward Espinoza, and the affidavits of Ernest Hayes and Melvin Goldstein. In her Response to the Motion, Respondent indicated that she does not oppose the Motion to Expand the Record and has filed some of the requested for documents with the Court. The Court now grants the Motion and, to the extent Respondent has not supplied all materials requested in the Motion, the Court orders Respondent to do so within thirty (30) days of the date of this Order.

## VII. Conclusion

Because the Court finds both that it is unnecessary to certify the proposed questions to the Ohio Supreme Court and that Keenan has failed to establish his actual innocence, the Court further finds that

Keenan did not demonstrate that the Court erred in dismissing his case for failure to comply with the statute of limitations. Accordingly, Keenan's Motion to Alter or Amend Judgment is denied. As stated in its Order of Dismissal, the Court grants a certificate of appealability pursuant to 28 U.S.C. § 2253 as to all issues raised in the Motion.

IT IS SO ORDERED.